UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
AARON RUBENSTEIN,                                            :
                                                             :
                            Plaintiff,                       :
                                                             :  Case No. 15-cv-9752 (VSB)
            -against-                                        :
                                                             :
vTv THERAPEUTICS, INC.,                                      :
                                                             :
            Nominal Defendant,                               :
                                                             :
            -and-                                            :
                                                             :
RONALD O. PERELMAN and                                       :
MACANDREWS & FORBES INC.,                                    :
                                                             :
            Defendants.                                      :
------------------------------------------------------------ X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Jonathan L. Hochman
SCHINDLER COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, New York 10005
(212) 277-6300

*Attorneys for Nominal Defendant vTv Therapeutics Inc. and Defendants Ronald O. Perelman and MacAndrews & Forbes Incorporated*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

UNDISPUTED FACTS ........................................................................................................ 2

ARGUMENT ......................................................................................................................... 4

I.    SECTION 16(B) LIABILITY REQUIRES A PURCHASE
AND SALE OF SECURITIES WITHIN SIX MONTHS .................................................... 5

II.   THERE IS NO SECTION 16(B) VIOLATION ABSENT
THE POTENTIAL FOR SPECULATIVE ABUSE ............................................................ 5

III.  THE IPO-RELATED TRANSFER OF SHARES TO
MJALLI WAS NOT A SECTION 16(B) "SALE" .............................................................. 7

      A.    The IPO-Related Transfer Of Shares To Mjalli Could
Not Be A "Sale" Because The Mjalli Securities Were
Not "Beneficially Owned" By Defendants ............................................................. 7

      B.    The IPO-Related Transfer Of Shares To Mjalli Was
Not A "Sale" Because Defendants Received No New
Or Different Consideration ...................................................................................... 8

      C.    The IPO-Related Transfer Of Shares To Mjalli Was
Not A "Sale" Because It Presented No Possibility Of
Speculative Abuse .................................................................................................... 9

IV.  THE "SALE" HERE OCCURRED MORE THAN SIX MONTHS
PRIOR TO DEFENDANTS' PURCHASES AND THEREFORE
DOES NOT VIOLATE SECTION 16(B) ......................................................................... 10

      A.    Purchases And Sales Occur For 16(b) Purposes When
The Parties' Obligations Become Fixed And Irrevocable .................................... 10

      B.    Defendants' Obligations To Mjalli Became Fixed And
Irrevocable On December 30, 2014 ...................................................................... 11

      C.    There Was No Contingency That Could Have Affected
Defendants' Fixed And Irrevocable Obligations To Mjalli ................................. 13

CONCLUSION .................................................................................................................... 15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 4

*Blau v. Lamb*,
    363 F.2d 507 (2d Cir. 1966) ............................................................................................. 6, 9

*Blau v. Ogsbury*,
    210 F.2d 426 (2d Cir. 1954) .................................................................................... 5, 10, 11

*Bruh v. Bessemer Venture Partners III L.P.*,
    No. 03 CIV. 7340 (GBD), 2005 WL 2087803
    (S.D.N.Y. Aug. 29, 2005), *aff'd*, 464 F.3d 202 (2d Cir. 2006) ........................................ 10, 11

*Chechele v. Sperling*,
    No. 11 Civ. 0146 (PAC), 2012 WL 1038653
    (S.D.N.Y. Mar. 29, 2012), *aff'd*, 758 F.3d 463 (2d Cir. 2014) .......................................... 5, 12

*CRA Realty Corp. v. Buffets, Inc.*,
    No. 3-87-CIV-662, 1988 WL 1058220 (D. Minn. Mar. 23, 1988) ..................................... 14

*DiLorenzo ex rel. Smithfield Foods, Inc. v. Murphy*,
    322 F. Supp. 2d 479 (S.D.N.Y. 2004) ..................................................................... 6, 7, 13, 14

*Donoghue v. Centillium Commc'ns Inc.*,
    No. 05 Civ. 4082 (WHP), 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006) ................. 6, 13, 14 n.7

*Donoghue v. Local.com Corp.*,
    No. 07 CIV. 8550 (LBS), 2009 WL 260797 (S.D.N.Y. Feb. 3, 2009), *aff'd sub
    nom. Donoghue v. Hearst Commc'ns, Inc.*, 355 F. App'x 520 (2d Cir. 2009) ..................... 7, 8

*Donoghue v. Murdock*,
    No. 13 Civ. 1224 (PAE), 2013 WL 4007565 (S.D.N.Y. Aug. 6, 2013) .............. 5, 13, 14, 14 n.7

*Feder v. Frost*,
    220 F.3d 29 (2d Cir. 2000) .................................................................................................... 7

*Hutchinson v. Watson*,
    607 F. App'x 116 (2d Cir. 2015) ........................................................................................... 4

*Ingrassia v. Cty. of Sullivan, N.Y.*,
    262 F. Supp. 2d 116 (S.D.N.Y. 2003) .............................................................................. 2 n.2

*Kern Cty. Land Co. v. Occidental Petroleum Corp.*,
   411 U.S. 582 (1973)..................................................................................................5, 5 n.3

*Magma Power Co. v. Dow Chemical Co.*,
   136 F.3d 316 (2d Cir. 1998).................................................................................................14 n.7

*Papasan v. Allain*,
   478 U.S. 265 (1986)....................................................................................................................5

*Prager v. Sylvestri*,
   449 F. Supp. 425 (S.D.N.Y. 1978) ................................................................................. *passim*

*Provident Sec. Co. v. Foremost-McKesson, Inc.*,
   506 F.2d 601 (9th Cir. 1974), *aff'd*, 423 U.S. 232 (1976) ...................................................6, 14

*Steel Partners II, L.P. v. Bell Indus., Inc.*,
   315 F.3d 120 (2d Cir. 2002)........................................................................................................5

*Stella v. Graham-Paige Motors Corp.*,
   232 F.2d 299 (2d Cir. 1956).....................................................................................................14

*Tasini v. AOL, Inc.*,
   505 F. App'x 45 (2d Cir. 2012) ..................................................................................................4

*Whittaker v. Whittaker Corp.*,
   639 F.2d 516 (9th Cir. 1981), *abrogated on other grounds*
   *by Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414 (2012) ..................................7

**Statutes and Other Authorities**

Peter J. Romeo & Alan L. Dye,
   *Section 16 Treatise And Reporting Guide* § 4.03 (4th ed. 2012)........................................7 n.5

Securities Exchange Act Section 16(b), 15 U.S.C. § 78p(b) .........................................................1

Ronald O. Perelman, MacAndrews & Forbes Incorporated ("MacAndrews" and together, "Defendants"), and Nominal Defendant vTv Therapeutics Inc. ("Therapeutics"), by their attorneys, Schindler Cohen & Hochman LLP, submit this memorandum of law in support of their motion to dismiss Plaintiff Aaron Rubenstein's ("Plaintiff") Second Amended Complaint (the "Complaint" or "Cmplt.").

## PRELIMINARY STATEMENT

Plaintiff seeks disgorgement of purported short-swing trading profits pursuant to Section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b) ("Section 16(b)"), which prohibits purchases and sales of securities by corporate insiders within a six-month matching period. Plaintiff's claims should be dismissed because there was no 16(b) sale within six months of Defendants' purchases here—and thus no violation.

On December 30, 2014, Defendants bought equity interests in two companies from a non-party, Adnan M.M. Mjalli ("Mjalli"), pursuant to a binding letter agreement (the "Letter Agreement").[1] Mjalli received an upfront cash payment and the right to receive at a later time 6% of the value of those companies—no matter how Defendants extracted value from those companies, be it by sale, IPO, asset sale, merger, or by simply continuing to operate them. Defendants relinquished any beneficial ownership or pecuniary interest in Mjalli's 6% and Defendants' obligations to Mjalli were fixed as of December 2014, when their obligation to deliver that 6% value to him became irrevocable and unconditional. No matter what form of payment was required to deliver Mjalli's 6%, Defendants had already surrendered their economic interest in it and could no longer profit from it. They would not receive anything

---

[1] The Letter Agreement is annexed as Exhibit A to the Declaration of Jonathan L. Hochman in Support of Defendants' Motion to Dismiss ("Hochman Dec."), submitted herewith.

additional from Mjalli, nor change their economic position relative to his, regardless of how they delivered his 6%. After December 2014, there simply was no possibility for Defendants to reap any unfair advantage from inside information with respect to Mjalli's 6%, or otherwise engage in the kind of speculative abuse that Section 16(b) was designed to prevent.

There is thus no 16(b) violation. The subsequent transfer of shares to Mjalli representing his 6% interest (in connection with the IPO of a successor to the companies Mjalli had sold to Defendants) was not a sale for Section 16(b) purposes. The law is clear that whether a transfer of money or securities constitutes a "sale" for Section 16(b) purposes depends on: (1) whether the defendant could have garnered a speculative profit from the use of inside information—the harm the prohibition of short-swing trading seeks to prevent; (2) whether the defendant was a beneficial owner of the securities who had a pecuniary interest in them; and (3) when the parties' obligations became fixed and irrevocable. Because the IPO-related transfer of shares to Mjalli merely satisfied Defendants' pre-existing obligation to deliver Mjalli's 6% payment, it did not transfer any pecuniary or economic interest and was not a sale. The actual sale of those interests took place in December 2014—far outside the six-month matching period for Defendants' later purchases. Thus, the undisputed facts do not constitute a Section 16(b) violation and the Complaint should be dismissed.

## UNDISPUTED FACTS

On December 30, 2014, the Defendants entered into the Letter Agreement with Mjalli.[2] The Letter Agreement fixed—and detailed—the rights and obligations of the parties. Mjalli sold

---

[2] The Court may properly consider the Letter Agreement on this motion to dismiss because it is incorporated by reference into the Complaint. *See* Cmplt ¶ 11 (alleging that "Defendants[] [had an] obligation to sell securities to the third party [sic] [Mjalli] under a pre-existing agreement between the Defendants and the third party [sic]"); *see also Ingrassia v. Cty. of Sullivan, N.Y.*, 262 F. Supp. 2d 116, 119 (S.D.N.Y. 2003) ("In assessing the legal

his minority interest in two companies, TransTech Pharma, LLC and High Point Pharmaceuticals, LLC (together the "Predecessor Companies"), to Defendants. In exchange, Mjalli received $7.5 million dollars (Letter Agreement § 3(a)) plus a 6% economic interest in the Predecessor Companies in those companies, which would be paid to him at a later date. (Letter Agreement § 2(a).)

The Letter Agreement set forth the possible forms in which Mjalli's fixed 6% value was to be distributed to him under each of the various possible future scenarios though which Defendants might realize value from the Predecessor Companies. For example, upon a sale of the Predecessor Companies, or simply Defendants' continued operation of them, Defendants would pay Mjalli in cash. (Letter Agreement § 2(c).) In the case of an IPO, Defendants would "make a payment to Mjalli in the common equity securities of the IPO Entity in an amount equal to six percent (6%) of the common equity of the IPO Entity." (Letter Agreement § 2(i).) But Mjalli was to receive the same, fixed 6% value in any case. (Letter Agreement §§ 2(a)-(k).) No matter how the Predecessor Companies or their successors produced value—whether by an IPO, a sale, a sale of assets, a merger, or by merely continuing their operations—Defendants were obligated to transfer the same fixed 6% value to Mjalli. (*Id.*)

The Letter Agreement provided that "Mjalli shall be paid . . . simultaneously with the consummation" of any IPO. (Letter Agreement § 2(j).) Such an IPO occurred on July 29, 2015, at which point Defendants transferred the fixed 6% value to Mjalli in the form of 1,344,186 shares of the Class A Common Stock of Therapeutics, a successor to the Predecessor Companies.

---

sufficiency of a claim, the court may consider those facts alleged in the Complaint, documents attached as an exhibit thereto or incorporated by reference, and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference.") (citations and internal quotation marks omitted). Furthermore, Plaintiff here has agreed that it is appropriate for the Court to consider the Letter Agreement. (Transcript of June 15, 2016 Pre-Motion Conference (Hochman Dec., Ex. B) at 4:5-11.)

3

(Cmplt. ¶ 11.)  The Complaint states that the "IPO constituted the fulfillment of one of several alternative contingencies . . . under a pre-existing agreement between Defendants and the third party [sic] [*i.e.*, the Letter Agreement]." (*Id*.)  Importantly, the complaint does **not** allege that Defendants received any additional consideration from Mjalli on that date or at any time thereafter.  Nor does the Letter Agreement provide for any consideration to be paid to Defendants in connection with transferring IPO shares to Mjalli.  (*See generally* Letter Agreement §§ 2(a)-(k).)  Rather, this transfer of 6% of Therapeutics common stock was precisely what was provided for by the Letter Agreement and was therefore merely a consummation of the December 30, 2014 transaction.

Defendants subsequently purchased Therapeutics stock on the open market in August 2015 through January 2016.  (Cmplt. ¶¶ 14-17.)  Plaintiff alleges that the post-IPO transfer of Therapeutics shares to Mjalli constituted a "sale" that can be matched for Section 16(b) purposes with Defendants' subsequent purchases.  (*Id*. ¶¶ 17-19.)  For the reasons below, Plaintiff is wrong as a matter of law.

## ARGUMENT

Courts grant motions to dismiss under Rule 12(b)(6) unless the plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Dismissal is thus warranted where a "[c]omplaint fails to allege facts that, even taken as true," are sufficient to make out a claim. *Tasini v. AOL, Inc.*, 505 F. App'x 45, 48 (2d Cir. 2012).  While facts pleaded must be accepted as true, "this tenet is inapplicable to legal conclusions." *Hutchinson v. Watson*, 607 F. App'x 116, 116-17 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A court is likewise, "not bound to accept as true a legal

4

conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  As demonstrated herein, the facts alleged in the Complaint fail to state a claim.

### I. SECTION 16(B) LIABILITY REQUIRES A PURCHASE AND SALE OF SECURITIES WITHIN SIX MONTHS

Section 16(b) liability requires "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period."  *Chechele v. Sperling*, No. 11 Civ. 0146 (PAC), 2012 WL 1038653, at *3 (S.D.N.Y. Mar. 29, 2012) (citing *Gwodzdzinsky v. Zell/Chillmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)), *aff'd*, 758 F.3d 463 (2d Cir. 2014).

### II. THERE IS NO SECTION 16(B) VIOLATION ABSENT THE POTENTIAL FOR SPECULATIVE ABUSE

Section 16(b) is designed to prevent insiders from profiting from their presumed possession of inside information through short-swing transactions.  *See Blau v. Ogsbury*, 210 F.2d 426, 426 (2d Cir. 1954) ("[S]peculation, actual or potential is the only vice within the purview of [Section] 16(b)"); *see also Donoghue v. Murdock*, No. 13 Civ. 1224 (PAE), 2013 WL 4007565, at *10 (S.D.N.Y. Aug. 6, 2013) ("[T]he purpose of § 16(b) . . . is to prevent the speculative abuse of inside information") (emphasis omitted).

Whether a Section 16(b) "sale" has occurred on a given date, then, must be analyzed in light of this purpose.  Courts—using what is referred to by the Second Circuit as the "pragmatic approach" for complex or non-traditional transactions[3]—do exactly that.  *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002); *see also Kern*, 411 U.S. at 594.[4]  Indeed,

---

[3]   *I.e.*, transactions, such as the one here, that are not simply a simultaneous exchange of money for securities.  *See Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593 (1973); *id.* at 593 n.24.

[4]   Plaintiff has suggested in his pre-motion letter (the "Letter Brief" (ECF No. 20)), that the pragmatic approach is not applicable here, claiming it only applies under *Kern* in certain circumstances.  (Letter Brief at 2.)

the Second Circuit, "appears always to have recognized that in deciding whether a certain transaction is a Section 16(b) 'purchase' or 'sale' it is relevant to *first* consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." *Blau v. Lamb*, 363 F.2d 507, 518 (2d Cir. 1966) (emphasis added)*; see also, e.g.*, *DiLorenzo ex rel. Smithfield Foods, Inc. v. Murphy*, 322 F. Supp. 2d 479, 481-82 (S.D.N.Y. 2004) (stating that "the purpose of Section 16(b) . . . is to discourage the speculative abuse of inside information by corporate insiders" and finding no Section 16(b) purchase had occurred where defendants "no longer had control over the transaction in any way that could be turned to speculative advantage") (internal citations and quotation marks omitted); *Sylvestri*, 449 F. Supp. at 432-33 (same). The Second Circuit is not alone in taking this approach. *See, e.g.*, *Provident Sec. Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601, 606 (9th Cir. 1974) ("the question of when a sale is complete for purposes of Section 16(b) must be decided so as to foster the goals of the federal legislation"), *aff'd*, 423 U.S. 232 (1976).

The result of this focus on the statute's remedial purpose is that absent the possibility of speculative abuse or wrongful use of inside information courts decline to find a Section 16(b) violation. *See, e.g., Lamb*, 363 F.2d at 521 (finding no Section 16(b) liability where "[t]he facts . . . standing alone[] . . . fail to establish that the conversion in any way made it possible for [defendant] . . . to reap speculative profits based on insider information"); *Donoghue v. Centillium Commc'ns Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *5 (S.D.N.Y. Mar. 28, 2006) (finding no Section 16(b) liability where "[defendant] was powerless to manipulate the

---

Plaintiff misreads *Kern,* which does not so hold, and ignores the unavoidable necessity of analyzing complex transactions by reference to the statute's purpose in any case. *See Prager v. Sylvestri*, 449 F. Supp. 425, 429 n.6 (S.D.N.Y. 1978) (collecting cases and finding that even when courts do not expressly utilize the "pragmatic approach," Section "16(b), like any other statute, is to be read and applied in light of its underlying purposes").

6

settlement of the [transaction] to his advantage"); *see also Murphy*, 322 F. Supp. 2d at 481-82; *Sylvestri*, 449 F. Supp. at 432-33.

### III. THE IPO-RELATED TRANSFER OF SHARES TO MJALLI WAS NOT A SECTION 16(B) "SALE"

Plaintiff contends that "under applicable SEC Rules," the IPO-related transfer should be "deemed" a sale of securities under Section 16(b). (Cmplt. ¶ 12.) In fact, the relevant SEC rules suggest just the opposite: that the July 29, 2015 transfer of shares was a non-event. Plaintiff's conclusory allegations ignore both the "longstanding rule that ownership is gained once the full consideration has been paid," *Donoghue v. Local.com Corp.*, No. 07 CIV. 8550 (LBS), 2009 WL 260797, at *4 (S.D.N.Y. Feb. 3, 2009), *aff'd sub nom. Donoghue v. Hearst Commc'ns, Inc.,* 355 F. App'x 520 (2d Cir. 2009), and settled Second Circuit interpretations of the purpose of Section 16(b).

#### A. The IPO-Related Transfer Of Shares To Mjalli Could Not Be A "Sale" Because The Mjalli Securities Were Not "Beneficially Owned" By Defendants

Securities transactions only fall under Section 16(b) if the securities are "beneficially owned" by the insider. *See, e.g., Feder v. Frost,* 220 F.3d 29, 33 (2d Cir. 2000); *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 526 (9th Cir. 1981), *abrogated on other grounds by Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414 (2012). Beneficial ownership, in turn, requires that the insider have a "pecuniary interest" in the subject securities.[5]

---

[5] "Rule 16a-1(a)(2) provides that the term 'beneficial owner' means, for all purposes under Section 16 other than calculating ten percent ownership, 'any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the [issuer's] equity securities.'" Peter J. Romeo & Alan L. Dye, *Section 16 Treatise And Reporting Guide* § 4.03 (4th ed. 2012). "The term 'pecuniary interest' in turn is defined to mean 'the opportunity, directly or indirectly, to profit or share in any profit from the transaction in the subject securities.'" *Id.*

Defendants lacked any such pecuniary interest in the securities that they were to transfer to Mjalli on July 29, 2015 (the "Mjalli Securities"). The Letter Agreement required that, in the event of an IPO of any successor to the Predecessor Companies, 6% of the resulting common equity from such IPO would be transferred to Mjalli. (Letter Agreement § 2(i).) Therapeutics was a successor to the Predecessor Companies. Therefore, upon its IPO on July 29, 2015: (i) Defendants had a fixed contractual commitment, dating back to December 30, 2014, to transfer 6% of Therapeutics' common equity (regardless of the price or timing of the IPO) to Mjalli (*id.*); (ii) Mjalli had a corresponding contractual right to receive the Mjalli Securities before they even came into existence (*id.*); and (iii) Defendants, consequently, had relinquished any opportunity to profit from the Mjalli Securities as of December 30, 2014.

The transfer to Mjalli in connection with the IPO thus could not be a "sale" under Section 16(b). Defendants had no pecuniary interest in the Mjalli Securities at that time because they could not profit from it, having previously transferred all economic interests corresponding to the Mjalli Securities in December 2014.

    **B.    The IPO-Related Transfer Of Shares To Mjalli Was Not A "Sale" Because Defendants Received No New Or Different Consideration**

Plaintiffs ignore the "longstanding rule that ownership is gained once the full consideration has been paid," *Local.com*, 2009 WL 260797, at *4; *see also Sylvestri*, 449 F. Supp. at 435 (finding no Section 16(b) purchase because, "in any case, [defendant] had already parted with the consideration for the stock he was receiving," before the alleged purchase date). Mjalli received his 6% economic interest in the Predecessor Companies at the time the Letter Agreement was executed on December 30, 2014. The consideration Mjalli paid on December 30, 2014 was, undisputedly, the *only* consideration he paid or was to pay for his right to receive

the Mjalli Securities in the event of an IPO. The Complaint does not allege Defendants received anything more from Mjalli on or after the IPO.[6] Nothing in the Letter Agreement contemplated the possibility of Defendants receiving new or different consideration after December 30, 2014. Defendants could not have "sold" something they had not owned for the prior eight months and, thus, any IPO-related transfer of shares to Mjalli was not a "sale."

### C. The IPO-Related Transfer Of Shares To Mjalli Was Not A "Sale" Because It Presented No Possibility Of Speculative Abuse

Because Defendants had no pecuniary interest in the Mjalli Securities and received no additional consideration upon their transfer, they did not and could not reap any speculative advantage from inside information after December 30, 2014. Therefore, treating the IPO-related transfer of the Mjalli Securities as a sale would not further Section 16(b)'s purposes. Approaching a similarly non-traditional transaction in *Lamb*, 363 F.2d 507, the Second Circuit refused to impose Section 16(b) liability because doing so would not have furthered the remedial purpose of the statute. *Id.* at 518. *Lamb* dealt with whether the conversion of preferred stock into common stock constituted a purchase of common stock under Section 16(b). *Id.* In holding that such a conversion was not a purchase, the court found that:

> [T]his judicial limitation on the reach of Section 16(b) is perfectly consistent with the section's underlying purpose of preventing the unfair use of inside information by corporate insiders. This underlying purpose provides no reason for the application of Section 16(b) to a transaction that poses no danger whatever of insider abuse.

*Id.* at 519.

---

[6] Indeed, by alleging that the price that the price at which Mjalli securities "were ***deemed sold*** by Defendants on July 29, 2015 . . . [was] the IPO price" (Cmplt. ¶13 (emphasis added)), the Complaint makes clear that Defendants did not actually receive any additional or contemporaneous payment in connection with the IPO.

Here, the Post-IPO transfer of shares to Mjalli posed no danger of insider abuse. Plaintiffs have not and cannot allege any means by which Defendants could actually have abused their position as insiders.  Rather, as set forth above, Defendants had already received the only consideration they ever would and therefore were not in position to benefit from inside information on July 29, 2015.  Consequently, the IPO-related transfer of shares should not be deemed a "sale."

### IV. THE "SALE" HERE OCCURRED MORE THAN SIX MONTHS PRIOR TO DEFENDANTS' PURCHASES AND THEREFORE DOES NOT VIOLATE SECTION 16(B)

#### A. Purchases And Sales Occur For 16(b) Purposes When The Parties' Obligations Become Fixed And Irrevocable

Put differently, the only sale here occurred in December 2014.  A sale takes place for 16(b) purposes, "when the alleged insider's rights and obligations [become] fixed." *Ogsbury*, 210 F.2d at 427; *see also Bruh v. Bessemer Venture Partners III L.P.*, No. 03 CIV. 7340 (GBD), 2005 WL 2087803, at *5 (S.D.N.Y. Aug. 29, 2005), *aff'd*, 464 F.3d 202 (2d Cir. 2006) (finding sale date to be the point "when [defendant's] rights and obligations became fixed and irrevocable"); *Sylvestri*, 449 F. Supp. at 432-33 (finding sale date to be "that point at which the investor becomes irrevocably committed to the transaction").

As the Second Circuit made clear in *Ogsbury*, the fixing of one's rights and obligations and thus the operative "sale" can occur prior to the transfer of stock or money.  210 F.2d at 427. *Ogsbury* involved a dispute around the defendant insider Ogsbury's option contract.  *Id.* at 426. The contract allowed Ogsbury the option to purchase 10,000 shares of his company's stock at a fixed price, but gave him the prerogative to delay payment at his discretion.  The court found that a purchase occurred upon the insider's notice of election to exercise his option—not two years

later when he finalized payment for the stock—even though "title and stockholder's rights remained in the company pending payment." *Id*. Even though legal title and concurrent rights had not been transferred, the earlier date was the point at which the insider, "incurred an irrevocable liability to take and pay for the stock" and, thus, was the relevant date for Section 16(b) analysis. *Id.* at 427. By contrast, the later payment of the purchase price and the transfer of shares were deemed non-events for Section 16(b) purposes. *Id.*

Similarly, *Bruh v. Bessemer* also found that a purchase was concluded at the moment of the execution of the contract, not at the later date when securities were transferred. *Bruh*, 2005 WL 2087803, at *5. In *Bruh*, the insider ("Bessemer") held Preferred Stock in VistaCare. An amended version of the Certificate of Incorporation of VistaCare provided that upon the closing of an IPO all Preferred Stock would automatically convert to Common Stock. *Id.* at *1. VistaCare completed an IPO on December 23, 2002 and Bessemer received VistaCare Common Stock. Bessemer shortly after sold its Common Stock to the public at a profit. *Id.* at *2. The plaintiff argued that the IPO provided Bessemer with a derivative security as of the date of the IPO, establishing a call equivalent position. The court stated that the "argument [was] unavailing" and held that the purchase occurred at the moment Bessemer signed its first Stock Purchase Agreement, as "[t]hat is when Bessemer's rights and obligations became fixed and irrevocable." *Id.* at *5.

### B. Defendants' Obligations To Mjalli Became Fixed And Irrevocable On December 30, 2014

Here, Defendants had a pre-existing fixed obligation to transfer 6% of the common equity to Mjalli in any IPO. (Letter Agreement § 2(i).) In other words, while the number of shares Mjalli was to receive on the IPO date was not fixed on December 30, 2014, the formula for

11

calculating that number was: Mjalli was to receive "common equity securities of the IPO Entity in an amount equal to six percent (6%) of the common equity of the IPO Entity." *Id*.

That neither party knew on December 30, 2014 what that 6% would be worth on the IPO date does not mean that Defendants' obligations were, as Plaintiff claims, "less than fixed and irrevocable." (Letter Brief at 2.) Rather, where value is to be calculated through a set formula, defendants' rights and obligations are deemed fixed and irrevocable on the date of agreement. *See Chechele*, 2012 WL 1038653, at *4-5 (finding that the sale date was that of the execution of the agreement because "the number of shares to be transferred on the settlement date was dictated by financial formulae and criteria set forth in the [agreement]") (internal quotes omitted).

Nowhere in the complaint does Plaintiff allege any manipulation in calculating the number of shares that Defendants were obligated to transfer to Mjalli, nor does Plaintiff plausibly allege the possibility of such manipulation. Further, even where defendants have had some ability to manipulate the *outcome* of a set formula (rather than the formula itself), courts have still deemed rights and obligations fixed at the date of agreement. In *Sylvestri*, for example, defendant Sylvestri ("Sylvestri") as sole owner of Tibbetts Water & Waste, Inc. ("Tibbetts"), entered into an Agreement and Plan of Merger ("Agreement") with Gable Industries, Inc. ("Gable"). *Sylvestri*, 449 F. Supp. at 428. At the time of the Agreement, Gable acquired Tibbetts and Sylvestri acquired 218,300 shares of Gable. *Id.* However, Sylvestri also acquired

> the right to receive additional shares from time to time, depending on the earnings of Tibbetts in the next four fiscal years. Generally, the plan provided that if Tibbetts' earnings in each of those years exceeded specified sums, defendant would receive Gable stock equal in value to a multiple of those "excess" earnings, using the average price of the stock during the relevant fiscal year as the basis for calculating the number of shares to be issued.

12

*Id.* Under the terms of the Agreement, the court found that Sylvestri had purchased all of his "earn-out" shares at the time of the Agreement, despite the fact that it was within Sylvestri's power (through "the effect his efforts would have on the profitability of Tibbetts") to control to some extent the value and number of additional stock he would be receiving. *Id*. at 433. The court also found that "uncertainty about the dates that any additional stock would be delivered to the defendant is of no consequence." *Id.*; *see also Murphy*, 322 F. Supp. 2d at 481 (finding similar "earn-out" shares held in escrow until pre-determined date were purchased at the time of agreement); *Murdock*, 2013 WL 4007565, at *9 (finding defendant had a "fixed and irrevocable . . . obligation to deliver a number of shares that, albeit unknown at the time he entered into the agreement, was to be determined by a set formula") (emphasis omitted).

Furthermore, whereas Sylvestri had the power to manipulate the outcome of the formula to his own advantage, Defendants here did not; any and all consideration they would receive was transferred on December 30, 2014. *See Centillium*, 2006 WL 775122, at *5 (finding no liability where defendant "was powerless to manipulate the settlement of the [transaction] to his advantage"). Defendants' rights and obligations were thus fixed and irrevocable as of the December 30, 2014 Letter Agreement.

### C. There Was No Contingency That Could Have Affected Defendants' Fixed And Irrevocable Obligations To Mjalli

Plaintiff contends that there existed a "material condition precedent" which rendered Defendants' obligations "less than fixed and irrevocable." (Letter Brief at 2.)[7] However, a

---

[7] Plaintiff *erroneously* contends that, upon the occurrence of the IPO, Defendants had a "choice to pay in cash or in kind [that] could have been instructed by access to inside information persuading them that the IPO price was inflated and would decline, as it did, making a share payment the preferable choice." (Letter Brief at 2). In fact, Defendants had no such choice. (Letter Agreement § 2(i).) The plain language of the Letter Agreement makes clear that, "[i]f there is an IPO . . . [Defendants] **shall or shall cause the IPO entity to make a payment to Mjalli in the**

13

condition precedent is only material if: (a) the non-occurrence of the condition allows one or both parties to terminate the agreement (*i.e.* it renders their rights and obligations "revocable") (*see CRA Realty Corp. v. Buffets, Inc.*, No. 3-87-CIV-662, 1988 WL 1058220, at *3 (D. Minn. Mar. 23, 1988); *Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 301 (2d Cir. 1956)); or (b) it subjects the parties to market risk (*i.e.* it renders their rights and obligations uncertain) (*see Provident*, 506 F.2d at 607 (finding sale subject to conditions to be consummated at date of agreement because "[n]one of these conditions subjected [seller] to any market risks after the date of the agreement"); *Murdock*, 2013 WL 4007565, at *9; *Murphy*, 322 F. Supp. at 481).

The only contingency here was the form in which Mjalli would realize his fixed-percentage interest (*i.e.,* whether by an IPO, a sale, a sale of assets, a merger, or merely by the companies' continuing operations). There was no condition in the Letter Agreement that could unwind or cancel the transaction, no market risk, and no ability to alter the parties' respective financial positions in the transaction. Regardless of any contingency, the economics of the transaction were fixed in December 2014: Defendants would receive Mjalli's equity interests in the Predecessor Companies, while Mjalli would receive $7.5 million plus a 6% interest in them, the form of which was to be determined at a later date.

Because there was no material condition precedent here, the date of the IPO is irrelevant to the 16(b) analysis and the date that the parties' obligations became fixed and irrevocable remains December 30, 2014. That date is safely outside of the six-month matching period for

---

*common equity securities of the IPO entity in an amount equal to six percent (6%)* of the common equity of the IPO Entity." (*Id*. (emphasis added).) In any case, even if Defendants did have a choice to pay in cash or stock, that choice is irrelevant for Section 16(b) purposes. *See Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 325 (2d Cir. 1998); *see also*, *Centillium*, 2006 WL 775122, at *4 (argument that option to pay in cash or stock is relevant "has been foreclosed by the Second Circuit's decision in *Magma Power*"); *Murdock*, 2013 WL 4007565, at *10 (same).

Defendants' purchases, which began in August 2015.  Accordingly, there is no violation and the Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants motion to dismiss the Complaint should be granted.

Dated: New York, New York
       July 15, 2016

SCHINDLER COHEN & HOCHMAN LLP


By:   /s/ Jonathan L. Hochman
     Jonathan L. Hochman

100 Wall Street, 15th Floor
New York, New York 10005
Tel:  (212) 277-6300
Fax:  (212) 277-6333
jhochman@schlaw.com

*Attorneys for Nominal Defendant vTv Therapeutics Inc. and Defendants Ronald O. Perelman and MacAndrews & Forbes Incorporated*