# EXHIBIT A

MACANDREWS & FORBES INCORPORATED
M&F TTP HOLDINGS LLC
35 East 62nd Street, New York, NY 10065


TRANSTECH PHARMA, LLC
HIGH POINT PHARMACEUTICALS, LLC
HIGH POINT CLINICAL TRIALS CENTER, LLC
4170 Mendenhall Oaks Parkway, High Point, NC 27265


December 30, 2014


Adnan M.M. Mjalli, Ph.D.
4160 Mendenhall Oaks Parkway, Suite 105
High Point, NC 27265

Sam's Investments, LLC
4160 Mendenhall Oaks Parkway, Suite 105
High Point, NC 27265

Oasis Investments, LLC
4160 Mendenhall Oaks Parkway, Suite 105
High Point, NC 27265

Re:   Repurchase of Membership Interests in TTP and HPP

Dear Dr. Mjalli:

This letter agreement (this "Letter Agreement") will confirm the agreement between (a) M&F TTP Holdings LLC, a Delaware limited liability company and MacAndrews & Forbes Incorporated, a Delaware corporation (collectively, "Holdings"), TransTech Pharma, LLC, a Delaware limited liability company ("TTP"), High Point Pharmaceuticals, LLC, a Delaware limited liability company ("HPP"), and High Point Clinical Trials Center, LLC, a Delaware limited liability company ("HPCTC" and together with TTP and HPP, the "Companies"), on the one hand, and (b) Adnan M.M. Mjalli, Ph.D. ("Mjalli"), Sam's Investments, LLC ("Sam's") and Oasis Investments, LLC ("Oasis" and together with Mjalli and Sam's, the "Mjalli Parties") as to the sale by the Mjalli Parties and the repurchase by:

(a)     TTP of (i) all of the outstanding membership units of TTP held by the Mjalli Parties as of the date hereof, including those set forth on Schedule A hereof (the "TTP Repurchased Units") and (ii) all of the issued options to purchase common membership units of TTP held by the Mjalli Parties as of the date hereof, including those set forth on Schedule A hereof (the "TTP Repurchased Options"); and

(b)     HPP of (i) all of the outstanding membership units of HPP held by the Mjalli Parties as of the date hereof, including those set forth on Schedule A hereof (the "HPP Repurchased Units") and (ii) all of the issued options to purchase common membership units of HPP held by the Mjalli Parties as of the date hereof, including those set forth on Schedule A hereof (the "HPP Repurchased Options" and collectively with the TTP Repurchased Units,

1

TTP Repurchased Options, HPP Repurchased Units and HPP Repurchased Options, the "Repurchased Interests").

Capitalized terms used herein but not otherwise defined shall have the meaning used in the Second Amended and Restated Operating Agreement of TTP, dated as of March 28, 2014 (the "TTP Operating Agreement") and the Second Amended and Restated Operating Agreement of HPP, dated as of March 28, 2014 (the "HPP Operating Agreement"). In consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Repurchase of Repurchased Interests; Notes.

(a)     Subject to the terms and conditions of this Letter Agreement, at the Closing (as defined below), the Mjalli Parties hereby sell, transfer and assign to TTP and TTP hereby purchases and accepts (i) all of the TTP Repurchased Units and (ii) all of the TTP Repurchased Options; and

(b)     Subject to the terms and conditions of this Letter Agreement, at the Closing (as defined below), the Mjalli Parties hereby sell, transfer and assign to HPP and HPP hereby purchases and accepts (i) all of the HPP Repurchased Units (as defined below) and (ii) all of the HPP Repurchased Options.

(c)     In connection with the transactions contemplated hereby, the Mjalli Parties agree effective as of the Closing, to vote their respective interests in TTP and HPP in favor of the following actions: (i) TTP Operating Agreement shall be amended and restated in its entirety as set forth on Exhibit A hereof (the "Amended TTP Operating Agreement") and (ii) the HPP Operating Agreement shall be amended and restated in its entirety as set forth on Exhibit B hereof (the "Amended HPP Operating Agreement"). The Mjalli Parties hereby agree to execute and deliver all consents and take all further action necessary to vote their respective interests in TTP and HPP in favor of the adoption of the Amended TTP Operating Agreement and the Amended HPP Operating Agreement.

(d)     Effective as of the Closing, the Mjalli Parties acknowledge and agree that they shall no longer be members or equity holders of TTP and HPP and except as specifically provided in Section 2, Section 3, and Section 4 of this Letter Agreement, they hereby waive and terminate any and all rights they have or may have had as members of TTP and HPP, including, without limitation, rights to receive distributions and allocations, rights of first offer, board designation or election rights, information rights, registration rights, consent rights, voting rights, and pre-emptive rights.

(e)     The parties agree and acknowledge that (x) each of that certain (i) Promissory Note dated as of July 30, 2009, issued by Mjalli to MacAndrews & Forbes Holdings Inc. for the original principal sum of $500,000 (as amended, supplemented or otherwise modified from time to time, the "2009 Note") and (ii) Promissory Note dated as of January 15, 2010 issued by Mjalli to MacAndrews & Forbes Holdings Inc. for the original principal sum of $500,000 (as amended, supplemented or otherwise modified from time to time, the "2010 Note") shall remain in full force and effect in accordance with its terms, subject to this Section 1(e), and (y) all membership units of TTP pledged as collateral with respect to the 2009 Note and the 2010 Note and all membership units of HPP pledged as collateral with respect to the 2009 Note and the 2010 Note, in each case pursuant to that certain Amended and Restated Pledge Agreement, dated as of March 28, 2014, by and between Mjalli and MacAndrews & Forbes Holdings Inc. (the

2

"Pledge Agreement"), are hereby being repurchased under Section 1(a) and 1(b) hereof and the Pledge Agreement is automatically terminated and of no further force and effect. Notwithstanding anything to the contrary contained herein or in the 2009 Note or the 2010 Note, if Mjalli is entitled to receive any proceeds under Section 2, such amounts, up to the 2009 Note Repayment Amount, with respect to the 2009 Note, and the 2010 Repayment Amount, with respect to the 2010 Note, shall be retained by TTP or HPP, as applicable, and paid to Holdings in satisfaction of the 2009 Note and 2010 Note as described in the immediately following sentence; provided, however, that such amounts retained by TTP or HPP, as applicable shall count towards the Distribution Cap. Notwithstanding anything to the contrary in the 2009 Note, (i) the 2009 Note shall be extinguished and terminated in full upon the earlier of the date that TTP and/or HPP retain proceeds pursuant to the immediately preceding sentence equal to the 2009 Note Repayment Amount and the date that TTP's and HPP's payment obligations pursuant to Section 2 terminate and (ii) the 2010 Note shall be extinguished and terminated in full upon the earlier of the date that TTP and/or HPP retain proceeds pursuant to the immediately preceding sentence equal to the 2010 Note Repayment Amount and the date that TTP's and HPP's payment obligations pursuant to Section 2 terminate. For the avoidance of doubt, the 2009 Note and 2010 Note shall terminate only as provided in the immediately preceding sentence and shall not terminate on their respective maturity dates as set forth therein. For purposes of this Section 1(e), the "2009 Note Repayment Amount" means, as of the applicable date of payment or deemed payment of the 2009 Note as provided in the immediately preceding sentence, all outstanding principal and accrued and unpaid interest on the 2009 Note and the "2010 Note Repayment Amount" means, as of the applicable date of payment or deemed payment of the 2010 Note as provided in the immediately preceding sentence, all outstanding principal and accrued and unpaid interest on the 2010 Note.

For the avoidance of doubt, that certain Promissory Note dated as of March 30, 2007, issued by Mjalli to TTP for the original principal sum of $4,800,000 (as amended, supplemented or otherwise modified from time to time, the "2007 Note") will remain in full force and effect. The Mjalli Parties will exchange any membership units of TTP pledged as collateral with respect to the 2007 Note with TTP for TTP Perpetual Securities (described below) and such TTP Perpetual Securities will be pledged as collateral with respect to the 2007 Note (the "TTP Pledged Units") and will exchange the membership units of HPP pledged as collateral with respect to the 2007 Note with HPP for HPP Perpetual Securities (described below) and such HPP Perpetual Securities will be pledged as collateral with respect to the 2007 Note (the "HPP Pledged Units") pursuant to that certain Reaffirmation and Pledge Agreement, dated as of March 28, 2014, by and between Mjalli and TTP.

Notwithstanding the foregoing, the Mjalli Parties hereby issue to TTP and HPP an irrevocable right and option to purchase all of the TTP Pledged Units and HPP Pledged Units (collectively, the "Pledged Units Option") upon the earlier of (x) the payment to the Mjalli Parties of Distributable Excess Equity Amounts greater than $30,000,000 and (y) the maturity date of the 2007 Note. The exercise price for the Pledged Units Option shall equal the amount then outstanding on the 2007 Note (all principal and accrued interest) ("Pledged Unit Exercise Price") and shall, solely at TTP's and HPP's respective options, be payable in either cash or the extinguishment of any obligation due by the Mjalli Parties with respect to the 2007 Note. Additionally, each of TTP and HPP hereby issue to the Mjalli Parties an irrevocable right and option to sell all of the TTP Pledged Units and HPP Pledged Units to TTP and HPP respectively, at any time prior to the exercise of the Pledged Units Option ("Pledged Units Put"). The exercise price for the Pledged Units Put shall equal the Pledged Unit Exercise Price and shall, solely at TTP's and HPP's respective options, be payable in either cash or the extinguishment of any obligation due by the Mjalli Parties with respect to the 2007 Note.

3

"TTP Perpetual Securities" shall mean perpetual securities of TTP in the principal amount of $6,049,962.62 that have no fixed maturity date.  The TTP Perpetual Securities shall accrue interest on their outstanding principal amount at a rate per annum equal to the interest rate applicable to the 2007 Note, payable upon redemption.  The parties shall treat the TTP Perpetual Securities as debt of TTP and not as equity of TTP for purposes of the TTP Operating Agreement, the application of Delaware and North Carolina commercial law, and all other applicable legal and commercial purposes.  Notwithstanding the foregoing, the TTP Perpetual Securities are and the parties shall treat the TTP Perpetual Securities as equity of TTP solely for U.S. federal income tax purposes and applicable state and local income tax purposes and any payment or deemed payment attributable to Mjalli in connection with the TTP Perpetual Securities shall be treated as payments in exchange for property of the Company, as described in Section 736(b) of the Code.

"HPP Perpetual Securities" shall mean perpetual securities of HPP in the principal amount of $543,870.38 that have no fixed maturity date.  The HPP Perpetual Securities shall accrue interest on their outstanding principal amount at a rate per annum equal to the interest rate applicable to the 2007 Note, payable upon redemption.  The parties shall treat the HPP Perpetual Securities as debt of HPP and not as equity of HPP for purposes of the HPP Operating Agreement, the application of Delaware and North Carolina commercial law, and all other applicable legal and commercial purposes.  Notwithstanding the foregoing, the HPP Perpetual Securities are and the parties shall treat the HPP Perpetual Securities as equity of HPP for U.S. federal income tax purposes and applicable state and local income tax purposes and any payment or deemed payment attributable to Mjalli in connection with the HPP Perpetual Securities shall be treated as payments in exchange for property of the Company, as described in Section 736(b) of the Code.

2.      Distributable Excess Equity Amounts.

(a)      TTP shall pay, or cause to be paid, to Mjalli an amount equal to six percent (6%) of any Distributable Excess Equity Amount (as defined below) in respect of TTP until Mjalli has received an amount, when aggregated with all other payments made pursuant to this Section 2(a), Section 2(b) and Section 2(i) hereof, equal to the Distribution Cap (which, for the avoidance of doubt, shall include the value of any Marketable Securities and any securities that are not Marketable Securities in the case of a Direct Equity Sale, a Member Distribution and a Sale Transaction under clause (ii) of the definition thereof if non-Marketable Securities are received in connection therewith, which non-Marketable Securities shall have the value as determined in Section 2(e) hereof).  This Section 2(a) shall terminate (x) concurrently with the consummation of (i) a Sale Transaction of TTP, (ii) the IPO (as defined below) of one or more IPO Entities (as defined below) that, individually or in the aggregate, hold all or substantially all of the assets of TTP, in either case, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such Sale Transaction or IPO, as applicable, (y) upon the receipt by Mjalli of an aggregate amount of payments pursuant to this Section 2(a), Section 2(b) and Section 2(i) equal to the Distribution Cap, or (z) upon the distribution of all of the assets of TTP to its equity holders in connection with the liquidation and dissolution of TTP.

(b)      HPP shall pay, or cause to be paid, to Mjalli an amount equal to six percent (6%) of any Distributable Excess Equity Amount (as defined below) in respect of HPP until Mjalli has received an amount, when aggregated with all other payments made pursuant to this Section 2(b), Section 2(a) and Section 2(i) hereof, equal to the Distribution Cap (which, for the avoidance of doubt, shall include the value of any Marketable Securities and any securities that are not Marketable Securities in the case of a Direct Equity Sale, a Member

4

Distribution and a Sale Transaction under clause (ii) of the definition thereof if non-Marketable Securities are received in connection therewith, which non-Marketable Securities shall have the value as determined in Section 2(e) hereof).  This <u>Section 2(b)</u> shall terminate (x) concurrently with the consummation of (i) a Sale Transaction of HPP or (ii) the IPO of one or more IPO Entities that, individually or in the aggregate, hold all or substantially all of the assets of HPP, in either case, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this <u>Section 2</u> in connection with such Sale Transaction or the IPO, as applicable, (y) upon the receipt by Mjalli of an aggregate amount of payments pursuant to this <u>Section 2(b)</u>, <u>Section 2(a)</u> and <u>Section 2(i)</u> equal to the Distribution Cap or (z) upon the distribution of all of the assets of HPP to its equity holders in connection with the liquidation and dissolution of HPP.

          (c)     As used herein, "<u>Distributable Excess Equity Amount</u>" means, as of the applicable date of determination:

          (i) in all cases other than a Direct Equity Sale (as defined below), Member Distributions (as defined below), in connection with a Sale Transaction (as defined below), or an IPO (as defined below), the Cash Balance that is in excess of the sum of (x) $25,000,000 (without duplication as to TTP, HPP and any Spin-Co (as defined below)) and (y) the Applicable Funded Investment Amount (as defined below);

          (ii) in the case of the sale of equity of TTP or HPP directly by Holdings or indirectly by the MacAndrews Group (as defined in each of the Amended TTP Operating Agreement and the Amended HPP Operating Agreement, in each case, as in effect immediately prior to Closing, and, which for purposes of this Agreement, shall not include TTP, HPP or their respective direct or indirect subsidiaries), or any transferee of such equity (such a sale, a "<u>Direct Equity Sale</u>"), through merger or otherwise, that is not a Sale Transaction, the amount of cash or securities, including Marketable Securities, actually received, without duplication, directly by Holdings or indirectly by any member of the MacAndrews Group, as applicable, in a Direct Equity Sale (the "<u>Shareholder Sale Proceeds</u>") that are in excess of the sum of (x) $25,000,000 (without duplication as to TTP, HPP and any Spin-Co (as defined below), with respect to any single transaction or series of related transactions involving TTP, HPP and/or any Spin-Co) and (y) the Applicable Funded Investment Amount (as defined below);

          (iii) in the case of distributions of cash or securities, including Marketable Securities, or other assets by TTP or HPP to the respective equity holders of TTP or HPP (excluding a distribution by TTP or HPP to their respective equity holders of equity securities of an entity that has succeeded to any of the assets of TTP or HPP, as applicable, in a "spin-off" or similar transaction (such distribution, a "<u>Spin-Off</u>" and such entity "<u>Spin-Co</u>")) (any such distribution other than a Spin-Off, a "<u>Member Distribution</u>"), the amount of such Member Distribution; and

          (iv) in the case of a Sale Transaction (x) under clause (i) of the definition thereof, the cash proceeds and/or Marketable Securities, received by TTP or HPP, as applicable, in connection with such transaction in excess of the sum of (a) a cash reserve for reasonable expenses as such amount is reasonably determined by the board of directors of TTP or HPP, as applicable, and (b) the Applicable Funded Investment Amount and (y) under clause (ii) of the definition thereof, the proceeds, whether cash or securities, including Marketable Securities, actually received, without duplication, by TTP, HPP, directly by the respective equity holders of TTP or HPP, as the case may be, or indirectly, without duplication, by the MacAndrews Group or any transferee of such equity held by the MacAndrews Group, that is in excess of the Applicable Funded Investment Amount.

For the avoidance of doubt, (a) if Mjalli actually receives a payment pursuant to this <u>Section 2</u> in connection with such Distributable Excess Equity Amount and the remaining portion of any Distributable Excess Equity Amount that is payable to the equity holders of TTP and HPP, as the case may be, is not actually distributed to equity holders of TTP or HPP, as the case may be (the "<u>Retained Amount</u>"), the Retained Amount shall not be considered for the purposes of determining any future amounts due to Mjalli under this <u>Section 2</u> and (b) any portion of the Cash Balance or Shareholder Share Proceeds that is subject to restrictions on their use, including any holdback or escrow, shall be excluded from the Cash Balance and the Shareholder Sale Proceeds until such restrictions are no longer applicable. For purposes of this <u>Section 2</u>, "<u>Cash Balance</u>" shall mean the amount of cash, cash equivalents, and Marketable Securities of TTP or HPP, as the case may be, as of the applicable calendar quarter in question. Notwithstanding anything herein to the contrary, in the event that (i) there is one or more Direct Equity Sales that results in payments to Mjalli pursuant to this <u>Section 2</u>, but that do not constitute Sale Transactions (each, a "<u>Prior Equity Sale</u>"), (ii) there is a subsequent Direct Equity Sale that results in a payment to Mjalli pursuant to this <u>Section 2</u> where the equity holders of TTP or HPP, as applicable, transfer equity interests in TTP or HPP, as applicable, representing an aggregate of 75% of the outstanding equity interests in TTP or HPP, as applicable, in such subsequent transaction (a "<u>Final Equity Sale</u>"), and (iii) the number of equity interests in TTP or HPP, as applicable, transferred in all Prior Equity Sales and the Final Equity Sale, in the aggregate, exceeds one hundred percent (100%) of the outstanding equity interests of TTP or HPP, as applicable (such excess amount, the "<u>Excess Percentage</u>"), then a portion of the payments originally received by Mjalli with respect to the Prior Equity Sales shall be credited against the amounts to be paid to Mjalli pursuant to this <u>Section 2</u> with respect to the Final Equity Sale (the "<u>Payment Credit</u>"). The Payment Credit shall be calculated by multiplying the amount received by Mjalli in all of the Prior Equity Sales by a fraction, the numerator of which is the Excess Percentage and the denominator of which is the percentage of all of the outstanding equity interests of TTP or HPP, as applicable, sold in all of the Prior Equity Sales with respect to TTP or HPP, as applicable.

(d)     As used herein, the "<u>Applicable Funded Investment Amount</u>" means, as of the applicable date of determination, with respect to TTP or HPP, as the case may be, an amount equal to the sum of (x) any equity investments made by Holdings, its affiliates (other than TTP and HPP) or any other third party in TTP or HPP, as the case may be, since the date hereof, including the portion of any Retained Amount that is used in the operations of TTP or HPP and treated as a contribution to the capital of TTP or HPP, as the case may be, and (y) the amount of outstanding indebtedness for borrowed money (plus accrued and unpaid interest thereon) for cash actually loaned to TTP or HPP, as the case may be, by Holdings and its affiliates and any other third party after the date hereof.

(e)     The parties acknowledge and agree that, for purposes of this <u>Section 2</u>, the value of any securities other than Marketable Securities, or other assets other than cash and cash equivalents, to be paid to Mjalli under this <u>Section 2</u>, shall be determined as follows: if such securities or other assets were paid as consideration in connection with a bona fide third party transaction, the value attributed to such securities or other assets in the definitive agreement for such transaction and, in all other cases, the fair market value of such securities as determined by the board of directors of TTP or HPP, as applicable. For purposes hereof, "fair market value" shall mean the price which a sophisticated purchaser, knowledgeable in the business of the applicable issuer of such securities or other assets, would pay for such securities or other assets as a going concern, taking into account goodwill and any other intangible assets of such entity's business and without giving effect to any minority or illiquidity discounts. If Mjalli disputes the value of the securities or other assets as determined in accordance with the first

sentence of this <u>Section 2(e)</u> in writing within 30 days of Mjalli's receipt of such determination (the "<u>Mjalli Dispute Notice</u>"), and Mjalli and TTP or HPP, as applicable, cannot reach an agreement within fifteen (15) days of the receipt by TTP and/or HPP, as applicable, of the Mjalli Dispute Notice, the fair market value of such securities or other assets shall be determined by an independent third party appraiser selected and paid for by TTP and/or HPP, as applicable (the "<u>TTP/HPP Appraiser</u>") in its sole discretion.  In the event Mjalli disagrees with the appraised fair market value, Mjalli shall have the right, within twenty (20) days of the delivery of the report generated by the TTP/HPP Appraiser, to appoint an independent third party appraiser selected and paid for by Mjalli (the "<u>Mjalli Appraiser</u>") in his sole discretion.  TTP, HPP and Holdings shall provide all relevant information to the Mjalli Appraiser in order for the Mjalli Appraiser to arrive at a value.  In the event that either TTP or HPP, as applicable, on the one hand, or Mjalli, on the other hand, disagrees with the appraised fair market value of the securities or other assets presented by the Mjalli Appraiser, then such party shall notify the other party within twenty (20) days of delivery of the report generated by the Mjalli Appraiser, and each of the TTP/HPP Appraiser and the Mjalli Appraiser shall appoint a third independent third party appraiser ("<u>Third Appraiser</u>") within ten (10) days of such disagreement.  The Third Appraiser shall determine the appraised fair market value of such securities or other assets within twenty (20) days of appointment and the appraised fair market value presented by the Third Appraiser shall be binding on all parties.  The costs of the Third Appraiser shall be borne equally by TTP and/or HPP, as applicable, on the one hand, and Mjalli, on the other hand.

(f)     As used herein, "<u>Distribution Cap</u>" shall mean an amount equal $150,000,000.

(g)     As used herein, "<u>Sale Transaction</u>" means (i) a sale of all or substantially all of the assets of TTP or HPP for cash, cash equivalents and/or Marketable Securities, as applicable, or (ii) a sale of equity interests (including a sale by equity holders) in either TTP or HPP, as applicable (including through merger or otherwise), where the equity holders of TTP or HPP, as applicable, immediately prior to such sale no longer hold, directly or indirectly, at least 75% of the equity interests in TTP or HPP, as applicable, immediately following such transaction.  For the avoidance of doubt, an initial public offering of equity securities of an IPO Entity (as defined below) registered under the United States Securities Act of 1933, as amended (an "<u>IPO</u>"), shall not constitute a Sale Transaction.  In addition, (i) any transaction between TTP or HPP, on the one hand, and any of the other of TTP or HPP, their respective officers, directors, equity holders or any of their respective affiliates shall not constitute a Sale Transaction and (ii) a Spin-Off shall not constitute an IPO or a Sale Transaction.

(h)     "<u>Marketable Securities</u>" means securities that are traded on an established securities exchange or otherwise reported or traded on an established over-the-counter trading system which are either freely transferable, including pursuant to the provisions of Rule 144 promulgated under the United States Securities Act of 1933, as amended, as in effect from time to time, or may be freely transferred following the exercise of immediately exercisable and obtainable registration rights granted to the holder thereof.  For purposes of determining the value of the Marketable Securities received pursuant to this Letter Agreement, (i) Marketable Securities received in connection with an IPO shall be valued at the final IPO price and (ii) Marketable Securities received in all other cases shall be valued based on the closing price of such Marketable Securities on the last business day immediately prior to the distribution of such Marketable Securities.

(i)     If there is an IPO of TTP or HPP, as the case may be, or any entity that has succeeded to any of the assets of the foregoing and which is issuing equity

securities in such IPO (other than an entity that is a successor as a result of a Spin-Off or Sale Transaction) (the "IPO Entity"), TTP or HPP, as applicable, shall or shall cause the IPO Entity to, make a payment to Mjalli in the common equity securities of the IPO Entity in an amount equal to six percent (6%) of the common equity of the IPO Entity that is actually received or otherwise held (or deemed held through securities that are convertible into common equity of the IPO Entity), without duplication, by TTP, HPP or directly by their respective equity holders in connection with such IPO minus the Applicable Funded Investment Amount (but excluding any amount in clause (y) of the definition of Applicable Funded Investment Amount that is assumed by the IPO Entity); provided, that in no event shall the payments made under this Section 2(i), when aggregated with all other payments made pursuant to Section 2(a) and Section 2(b) hereof exceed the Distribution Cap (which for the avoidance of doubt shall include the value of any Marketable Securities and any securities that are not Marketable Securities in the case of a Sale Transaction under clause (ii) of the definition thereof if non-Marketable Securities are received in connection therewith, which non-Marketable Securities shall have the value as determined in Section 2(e) hereof. This Section 2(i) shall terminate with respect to TTP or HPP, as applicable, concurrently with (x) the consummation of (i) a Sale Transaction of TTP or HPP, as applicable or (ii) the IPO of one or more IPO Entities that, individually or in the aggregate, hold all or substantially all of the assets of TTP and/or HPP, as applicable, in any case subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such Sale Transaction or IPO, (y) upon the receipt by Mjalli of an aggregate amount of payments pursuant to this Section 2(b), Section 2(a) and Section 2(i) equal to the Distribution Cap or (z) or upon the distribution of all of the assets of TTP or HPP, as applicable, to its equity holders in connection with the liquidation and dissolution of TTP or HPP, as applicable.  As a condition to the receipt of any stock pursuant to this Section 2(i), Mjalli shall be required to execute any lock-up or similar agreement as may be requested by the underwriter substantially in the form that Holdings (or an affiliate of Holdings) executes in connection with its receipt thereof (provided that the lock-up or similar restriction period shall be the same period as that agreed to be Holdings and its affiliates).  Holdings shall use its reasonable best efforts to negotiate any such lock-up or similar restriction such that it is on market terms as determined at the time of such negotiation.

(j)      Payments required to be made to Mjalli under this Section 2 shall be paid as follows: (i) in all cases other than a Sale Transaction, an IPO, Member Distributions, Direct Equity Sales and a Spin-Off (as defined herein), Mjalli shall be paid in cash, cash equivalents or Marketable Securities, as applicable, within fifteen days after the end of each calendar quarter in which a payment is required to be made pursuant to this Section 2; (ii) in the case of an IPO or Sale Transaction, Mjalli shall be paid in cash, securities or Marketable Securities as provided in Section 2(c) and 2(i), if applicable, simultaneously with the consummation thereof; provided that, Holdings shall pay or cause such amounts to be paid to Mjalli; (iii) in the case of Member Distributions, Mjalli shall be paid in the same type of consideration paid to the equity holders of TTP and HPP, as applicable, whether in cash or securities, including Marketable Securities, on the date such Member Distribution is paid to the equity holders of TTP or HPP, as the case may be; provided, that, in the case of a Sale Transaction contemplated by clause (i) of the definition thereof or any transfer or sale, including by way of merger, of assets of TTP or HPP to a company with common securities that are registered under the Securities Exchange of 1934, as amended, in either case pursuant to which TTP or HPP, as applicable, received Marketable Securities, TTP or HPP as applicable shall distribute such Marketable Securities to its equity holders upon receipt of such Marketable Securities, or (iv) in the case of a Direct Equity Sale, Mjalli shall be paid in the same type of consideration paid, without duplication, directly to Holdings or indirectly to any member of the MacAndrews Group, as applicable, or any of their respective prior transferees with respect to

8

such equity, whether in cash or securities, including Marketable Securities, within 15 days following the end of the month in which such transaction was consummated; provided that Holdings shall pay or cause such amounts to be paid to Mjalli. Until the earlier of (x) a Sale Transaction of TTP or HPP, as applicable, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such Sale Transaction, (y) the IPO of one or more IPO Entities that, individually or in the aggregate, hold all or substantially all of the assets of TTP and/or HPP, as applicable, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such IPO and (z) the date that Mjalli has received aggregate payments under Section 2(a), (b) and (i) equal to the Distribution Cap (which, for the avoidance of doubt, shall include the value of any Marketable Securities and any securities that are not Marketable Securities in the case of a Sale Transaction under clause (ii) of the definition thereof if non-Marketable Securities are received in connection therewith, which non-Marketable Securities shall have the value as determined in Section 2(e) hereof), TTP and HPP, as the case may be, shall provide (and Holdings shall cause TTP and HPP to provide) to Mjalli: (A) notice of (x) a Spin-Off, a Sale Transaction or IPO of an IPO Entity within 3 days prior to the consummation thereof, (y) any Direct Equity Sale within 15 days following the end of the month in which such transaction was consummated, and (z) any material transaction (other than a Sale Transaction, IPO, Spin-Off or Direct Equity Sale) involving TTP or HPP or its assets, including the sale or transfer of any material assets or programs, within 30 days following such material transaction, together with a description of the consideration received in connection therewith, (B) within fifteen (15) days following the end of each calendar quarter, a certification from the CFO of TTP and HPP, as the case may be, setting forth (i) the Cash Balance in such calendar quarter and the amount, if any, payable to Mjalli under Section 2 hereof, (ii) a calculation of any Applicable Funded Investment Amount and (iii) if applicable, a certification that no transaction described in clause (A)(y) or (z) of this sentence has occurred in such calendar quarter, and (C) within thirty (30) days following the end of each calendar quarter, unreviewed, unaudited and management-prepared consolidated balance sheets for each of TTP and HPP as of the last day of such quarter together with consolidated statements of income and cash flows for such calendar quarter for each of TTP and HPP. Mjalli shall have 30 days following the delivery of the information provided to him under clause (B) above to request a conference call with the chief financial officer (or person serving a similar function if there is no chief financial officer) to discuss the contents thereof (including the calculations of the Cash Balance, the Applicable Funded Investment Amount and the amount, if any, payable to Mjalli) under this Section 2.

(k)    In all cases other than a Direct Equity Sale or a Sale Transaction described in clause (ii) of the first sentence of Section 2(g), any payments made to Mjalli under this Section 2 shall be treated as payments described in Section 736(a) of the Internal Revenue Code of 1986, as amended (the "Code"). In the case of a Direct Equity Sale or a Sale Transaction described in clause (ii) of the first sentence of Section 2(g), any payment made to Mjalli under this Section 2 shall be treated as payments described in Section 741 of the Code in exchange for Mjalli's partnership interests in TTP, HPP, or both, as applicable. The provisions of this Section 2 shall constitute part of the Amended TTP Operating Agreement and the Amended HPP Operating Agreement within the meaning of Section 761(c) of the Code, as amended. Notwithstanding Section 1 hereof, solely for purposes of the payments provided in this Section 2 and related allocations of taxable income of TTP and HPP, Mjalli shall be treated as a partner of TTP and HPP for U.S. federal income tax purposes and applicable state and local income tax purposes until the earlier of (x) a Sale Transaction of TTP or HPP, as applicable, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such Sale Transaction, (y) an IPO of the IPO Entity involving the transfer of all or substantially all of the assets of TTP or HPP, as applicable, subject to the receipt by Mjalli of the amounts required to be paid to Mjalli under this Section 2 in connection with such IPO and (z)

the date that Mjalli has received aggregate payments under <u>Section 2(a)</u>, <u>(b)</u> and <u>(i)</u> equal to the Distribution Cap (which, for the avoidance of doubt, shall include the value of any Marketable Securities and any securities that are not Marketable Securities in the case of a Sale Transaction under clause (ii) of the definition thereof if non-Marketable Securities are received in connection therewith, which non-Marketable Securities shall have the value as determined in <u>Section 2(e)</u> hereof)).

(l)    Holdings, TTP, HPP and their respective affiliates shall undertake any material transaction involving the business, assets or equity interests of TTP or HPP, as applicable, including any Sale Transaction or IPO, on an arms-length basis.

(m)    In the event of a Spin-Off, Holdings, TTP and HPP shall cause Spin-Co as a condition to the consummation of the Spin-Off to execute a definitive agreement containing the provisions set forth in this <u>Section 2</u> whereby Spin-Co would be subject to the same obligations of TTP and HPP pursuant to <u>Section 2</u> hereof and TTP and HPP would be subject to the same obligations of Holdings and the MacAndrews Group.

(n)    The parties expressly agree to file their respective U.S. federal and state and local income tax returns in a manner consistent with the tax characterization of the payments to Mjalli as set forth in <u>Section 2(k)</u> and in <u>Section 3(a)</u> of this Agreement.

3.    <u>Payments from Holdings and TTP.</u>

(a)    TTP and HPP shall pay to Mjalli an aggregate amount in cash equal to $7,500,000 (without interest) consisting of (i) an initial amount equal to $2,500,000 to be paid at the Closing (the "<u>Closing Amount</u>") and (ii) an amount equal to $5,000,000 payable in quarterly installments (each, a "<u>Quarterly Distribution</u>") on the applicable date set forth on <u>Schedule B</u> hereof (each payment date of an Quarterly Distribution set forth on <u>Schedule B</u> referred to herein as a "<u>Quarterly Distribution Payment Date</u>"). The Closing Amount and each Quarterly Distribution shall be made by wire transfer of immediately available funds to such account or accounts designated in writing by Mjalli to TTP or HPP, as the case may be, prior to Closing (in the case of the Closing Amount) and at least two days in advance of the applicable Quarterly Distribution Payment Date (in the case of a Quarterly Distribution); <u>provided</u>, that in the event TTP or HPP do not have the funds necessary to make such payments, Holdings shall make such payments, directly, or indirectly in the form of debt and/or equity contributions, to TTP and/or HPP and to cause TTP and/or HPP to make the required payments hereunder on or before the applicable Quarterly Distribution Payment Date; and <u>provided</u>, <u>further</u> <u>however</u>, that any such debt or equity contribution shall not be included in the Applicable Funded Investment Amounts. TTP and HPP may elect, in their sole discretion, to prepay any Quarterly Distribution in advance of the applicable Quarterly Distribution Payment Date. Any payments made by TTP or HPP under this <u>Section 3</u> shall be treated as payments in exchange for property of the Company, as described in Section 736(b) of the Code.

(b)    In addition to the Closing Amount, from the date hereof through March 28, 2016, TTP shall pay, and Holdings shall cause TTP to pay, Mjalli an amount equal to the sum of that portion of his Base Salary (as defined in that certain Employment Agreement dated March 28, 2014, by and among Mjalli and HPCTC (the "<u>Employment Agreement</u>")) due to Mjalli through March 28, 2016 under the terms of the Employment Agreement and his present level of benefits, which sum shall be payable to Mjalli pursuant to the Employment Agreement in continuing installments on the same dates that Mjalli is entitled to receive such portion of his

Base Salary pursuant thereto. The parties acknowledge and agree that any restrictive covenants that restricted Mjalli's ownership and operation of HPCTC are of no further force and effect.

    4.    <u>Transfer of HPCTC</u>.

    (a)    On the date hereof, TTP, as the sole stockholder of HPCTC, hereby transfers and assigns to Mjalli all of the issued and outstanding membership interests of HPCTC (the "<u>Transferred HPCTC Units</u>") so that immediately following such transfer, Mjalli owns 100% of the outstanding equity interests in HPCTC.

    (b)    TTP shall make the following payments to HPCTC in connection with the operations of HPCTC from and after the date hereof:

    (i)    $115,000, which represents the parties agreement on the amount of working capital expenses expected to be incurred by HPCTC from the date hereof through December 31, 2014, which amounts shall be paid to HPCTC within two (2) business days after the date hereof;

    (ii)    beginning on January 1, 2015, $780,000 to pay for working capital expenses of HPCTC, payable in three equal installments of $260,000 on each of January 1, 2015, February 1, 2015 and March 1, 2015;

    (iii)    all rent due through March 31, 2016, payable at least two (2) days prior to the date such rent becomes due and payable pursuant to the terms of that certain Lease Agreement, effective as of January 1, 2008, by and between TTP and Liberty Property Limited Partnership, as amended by that certain Amendment 1 to Lease Agreement, effective as of January 1, 2013, and that certain Second Amendment to Lease Agreement, effective as of April 1, 2013, as in effect on the date hereof and as the same may be amended from time to time (collectively, the "<u>Lease</u>"); and

    (iv)    subject to <u>Section 4(c)</u> below, the termination fee of $180,000 payable on the delivery of the Termination Notice (as defined in the Lease).

    (c)    After the Closing, Mjalli may seek the approval of the Landlord (as defined in the Lease) to assign the Lease to Mjalli or his affiliates in accordance with the terms of the Lease. If the Landlord consents to the assignment to Mjalli of the Lease, the payment of the termination fee pursuant to <u>Section 4(b)(iv)</u> hereof shall be made to Mjalli (and not to the Landlord). If the Landlord declines to consent to the assignment to Mjalli of the Lease, TTP shall remain the Tenant (as defined in the Lease) and make such space available to HPCTC substantially in the same manner as conducted as of the date hereof; <u>provided</u>, <u>however</u>, that in the event TTP is required to make any payments under the Lease that are not referenced in <u>Sections 4(b)(iii)</u> or <u>(b)(iv)</u> above, then Mjalli shall indemnify and hold TTP harmless for any such payments that are directly caused by Mjalli or HPCTC. The Mjalli Parties acknowledge that if the Landlord declines to consent to the assignment to Mjalli of the Lease, TTP intends to terminate such Lease effective March 31, 2016 by delivering a Termination Notice prior to June 30, 2015 in accordance with the terms of the Lease.

    (d)    For so long as TTP remains the Tenant under the Lease, Mjalli will cause HPCTC to retain professional liability insurance and errors and omissions insurance on the same terms reasonably acceptable to TTP, but in no event shall TTP require Mjalli or HPCTC

to obtain insurance coverage in excess of any coverage required to be obtained by TTP pursuant to the Lease, and which insurance shall name TTP as an additional insured thereunder.

     5.      <u>Uncommitted Advance Agreement and other Note Documents</u>.

     (a)     At, and subject to, the Closing, that certain Uncommitted Advance Agreement, dated as of March 28, 2014 (as amended, supplemented or otherwise modified from time to time, the "<u>Uncommitted Advance Agreement</u>"), among TTP, HPP, Holdings, as an Investor, Mjalli, as an Investor, and Holdings, as Collateral Agent (the "<u>Collateral Agent</u>"), is hereby amended by removing Mjalli as a party thereto in all respects. Each of the parties to the Uncommitted Advance Agreement hereby confirms that, subject to the Closing, Mjalli shall have no further rights or obligations under the Uncommitted Advance Agreement, including, without limitation, the right or obligation to make Uncommitted Advances (as defined in the Uncommitted Advance Agreement) to TTP and HPP pursuant to the Uncommitted Advance Agreement and the right to consent to any amendment, supplement or other modification of or to any provision of any Note Document (as defined in the Uncommitted Advance Agreement). Mjalli further confirms that he has made no Uncommitted Advances under the Uncommitted Advance Agreement and that no amounts (including, without limitation, any Current Balance or Unpaid Interest (each as defined in the Uncommitted Advance Agreement)) are owed to him under the Uncommitted Advance Agreement and none of HPP, TTP, MF or their affiliates shall have any liability to Mjalli and his affiliates under the Uncommitted Advance Agreement.

     (b)     Subject to the Closing, HPCTC is hereby released and will have no further liabilities or obligations (including with respect to any indemnification obligations that would otherwise expressly survive the termination thereof) under (i) that certain Guarantee Agreement, dated and effective as of March 28, 2014, among HPCTC, each other person that is a party thereto as a guarantor and the Collateral Agent and (ii) that certain Security Agreement, dated and effective as of March 28, 2014 (as amended, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>"), among TTP, HPP, HPCTC, each other person that is a party thereto as a grantor and the Collateral Agent (and the Collateral (as defined in the Security Agreement) granted under the Security Agreement by HPCTC, subject to the Closing, is hereby released). The Collateral Agent, at the request of HPCTC and the expense of HPCTC, shall execute and deliver to HPCTC all releases or other documents reasonably necessary or desirable for the release of the Liens (as defined in the Uncommitted Advance Agreement) created pursuant to the Security Agreement on the Collateral granted by HPCTC.

     6.      <u>Resignation</u>. Mjalli hereby resigns, effective as of Closing, from the boards of directors or similar governing bodies of TTP, HPP and any direct or indirect subsidiary of TTP or HPP (other than HPCTC), from any committee of any of the foregoing, and from all positions as an officer of TTP, HPP and any direct or indirect subsidiary of TTP or HPP (other than HPCTC).

     7.      <u>Closing</u>. The closing of the transactions contemplated in this Letter Agreement (the "<u>Closing</u>") shall occur at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 simultaneously with the execution of this Letter Agreement by the Mjalli Parties.

     8.      <u>Closing Deliverables of the Mjalli Parties</u>. At the Closing, the Mjalli Parties shall deliver to TTP and HPP all executed written member consents and board consents necessary to effect the adoption of the Amended TTP Operating Agreement and the Amended

HPP Operating Agreement and executed signature pages to the Amended TTP Operating Agreement and the HPP Operating Agreement.

9.    Closing Deliverables of the Companies.  At the Closing, TTP and HPP shall deliver to Mjalli the Closing Amount (payable as set forth in Section 3 hereof) and an assignment of the Transferred HPCTC Units in the form attached as Exhibit C.

10.    Representations and Warranties of the Mjalli Parties.  The Mjalli Parties hereby make the following representations and warranties to the Companies and Holdings on a joint and several basis:

(a)    Ownership of Repurchased Interests.  Each of the Mjalli Parties have, and at the Closing will have, good and marketable right, title and interest (legal and beneficial) in and to their respective Repurchased Interests, free and clear of all liens, pledges, security interests, charges, contractual obligations, claims or encumbrances of any kind.  At the Closing, the Mjalli Parties will convey the Repurchased Interests to Holdings free and clear of all liens, pledges, security interests, charges, contractual obligations, claims or encumbrances of any kind other than those contained in the Amended TTP Operating Agreement, the Amended HPP Operating Agreement, or for the benefit of TTP, HPP, Holdings or their respective affiliates.

(b)    Authorization.  Each of the Mjalli Parties has full power and authority and requisite capacity to enter into this Letter Agreement, to perform its or his obligations hereunder and to consummate the transactions contemplated hereby.  This Letter Agreement constitutes a valid and binding obligation of each of the Mjalli Parties, enforceable against each Mjalli Party in accordance with its terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

(c)    Compliance with Other Instruments.  Neither the execution and delivery of this Letter Agreement nor the consummation of any of the transactions contemplated hereby nor compliance with or fulfillment of the other terms, conditions and provisions hereof or thereof will (i) result in the creation of any mortgage, pledge, lien, security interest, encumbrance, contractual obligation or charge upon the Repurchased Interests, or (ii) be the subject of any rights of refusal, rights of first offer, or tag along rights that have not been previously waived other than those contained in the Amended TTP Operating Agreement or the Amended HPP Operating Agreement.  None of the Mjalli Parties have granted any options of any sort with respect to the Repurchased Interests other than under this Letter Agreement.

(d)    Disclosure of Information.  Each of the Mjalli Parties has received all the information it or he considers necessary or appropriate for deciding whether to sell the Repurchased Interests to Holdings pursuant to this Letter Agreement.  Each of the Mjalli Parties further represent that it or he has had an opportunity to ask questions and receive answers from the Companies and Holdings and their management regarding the business, properties, prospects and financial condition of the Companies.  The Mjalli Parties acknowledge (i) that the Companies or Holdings have not made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and repurchase of the Repurchased Interests or HPCTC, the operation or financial condition of the Companies or HPCTC or the value of the Repurchased Interests or HPCTC, and (ii) that the Companies and Holdings are relying upon the truth of the representations and warranties in this Section 10 in connection with the sale and repurchase of the Repurchased Interests hereunder.

(e)     Tax Consequences.  Each Mjalli Party has had an opportunity to review the federal, state and local tax consequences of the sale and repurchase of the Repurchased Interests and the other transactions contemplated by this Letter Agreement with its or his own tax advisors.  Each Mjalli Party is relying solely on such advisors and, except as expressly set forth herein, not on any statements or representations of the Companies or Holdings.  Each Mjalli Party understands that it or he (and not the Companies or Holdings) shall be responsible for its or his own tax liability that may arise as a result of the transactions contemplated by this Letter Agreement.

11.     Representations and Warranties of the Companies and Holdings.  The Companies and Holdings hereby make the following representations and warranties to the Mjalli Parties on a joint and several basis:

(a)     Ownership of Transferred HPCTC Units.  TTP has, and at the Closing will have, good and marketable right, title and interest (legal and beneficial) in and to the Transferred HPCTC Units, free and clear of all liens, pledges, security interests, charges, contractual obligations, claims or encumbrances of any kind.  At the Closing, TTP will convey the Transferred HPCTC Units to Mjalli free and clear of all liens, pledges, security interests, charges, contractual obligations, claims or encumbrances of any kind.

(b)     Authorization.  Each Company and Holdings has full power and authority and requisite capacity to enter into this Letter Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  This Letter Agreement constitutes a valid and binding obligation of each Company and Holdings, enforceable against each Company and Holdings, as applicable, in accordance with its terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

(c)     Compliance with Other Instruments.  Neither the execution and delivery of this Letter Agreement nor the consummation of any of the transactions contemplated hereby nor compliance with or fulfillment of the other terms, conditions and provisions hereof or thereof will (i) result in the creation of any mortgage, pledge, lien, security interest, encumbrance, contractual obligation or charge upon the Transferred HPCTC Units, or (ii) be the subject of any rights of refusal, rights of first offer, or tag along rights that have not been previously waived.  None of the Companies nor Holdings has granted any options of any sort with respect to the Transferred HPCTC Units other than under this Letter Agreement.

(d)     Disclosure of Information.  Each of the Companies and Holdings has received all the information it considers necessary or appropriate for deciding whether to purchase the Repurchased Interests pursuant to this Letter Agreement.  Each of the Companies and Holdings further represents that it has had an opportunity to ask questions and receive answers from the Mjalli Parties regarding the business, properties, prospects and financial condition of the Companies.  The Companies and Holdings acknowledge (i) that the Mjalli Parties have not made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and repurchase of the Repurchased Interests or HPCTC, the operation or financial condition of the Companies or HPCTC or the value of the Repurchased Interests or HPCTC, and (ii) that the Companies and Holdings are relying solely upon the truth of the representations and warranties in this Section 11 in connection with the sale and repurchase of the Repurchased Interests hereunder.

12.     Expenses.  TTP and/or HPP shall pay each party's attorneys' fees and costs incurred in connection with this Letter Agreement and the transactions contemplated hereby; provided that TTP and/or HPP shall not pay any attorneys' fees of the Mjalli Parties other than those attorneys' fees owed by the Mjalli Parties to McKenna Long & Aldridge LLP; and provided, further, that the Mjalli Parties' attorneys' fees payable by TTP and/or HPP shall not, in the aggregate, exceed $120,000.

13.     Confidentiality.  Each party hereto will keep in strict confidence any confidential or proprietary matters (except publicly available or freely usable material as otherwise obtained from another source not in violation of any confidentiality obligations to which such source is subject) with respect to the each other party.  This confidentiality agreement includes the terms of this Letter Agreement.  Notwithstanding the foregoing, (1) TTP may, with Mjalli's prior written approval, issue a press release on or after the date hereof stating that TTP no longer owns any interest in HPCTC, and that Mjalli owns all of the outstanding interests in HPCTC and (2) any party may disclose such confidential information (a) to its immediate attorney(s), advisor(s) and accountant(s), if any, to the extent necessary for legal or investment advice or income tax reporting purposes (provided that such party ensures that such persons maintain the confidentiality thereof), (b) in response to a subpoena duly issued by a court of law or a government agency having proper jurisdiction or power to compel such disclosure or as otherwise  may be required by law, or (c) in connection  with the enforcement of this Letter Agreement.

14.     Indemnification.  TTP And HPP shall indemnify and hold harmless Mjalli and provide for such advancement of expenses in accordance with Section 5.5 of the TTP Operating Agreement and Section 5.4 of the HPP Operating Agreement, as applicable, in either case as in effect immediately prior to the date hereof; provided that in no event shall Mjalli be entitled to such indemnity or expense advancement in connection with any claim by Mjalli against TTP, HPP, Holdings and their respective officers, directors, equity holders and affiliates except in connection with (i) a claim by Mjalli to enforce such indemnification and advancement rights in connection with any other claim for which he is entitled to indemnification in accordance with such agreements, and (ii) any counter-claim or cross-claim by Mjalli against such parties that relates to the same subject matter as and is brought in connection with any claim initially made by such parties against Mjalli for which Mjalli is entitled to indemnification and advancement of expenses in accordance with such agreements.

15.     Miscellaneous.

(a)     Governing Law.  This Letter Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(b)     Dispute Resolution.  In the event of any dispute, claim, question, or disagreement arising from or relating to this Letter Agreement or the breach thereof, the parties hereto shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and attempt to reach a just and equitable solution satisfactory to all parties. If they do not reach such solution within a period of sixty (60) days, then, upon notice by either party to the other, all disputes, claims, questions, or differences shall be finally settled by arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules conducted in Wilmington, Delaware.

(c)        Successors and Assigns.  This Letter Agreement shall be binding upon and inure to the benefit of the respective heirs, successors and permitted assigns of the parties; provided, that no party shall have the right to assign its rights or delegate any duties hereunder without the prior written consent of the other parties.

(d)        Entire Agreement.  This Letter Agreement, along with the Amended TTP Operating Agreement, Amended HPP Operating Agreement and the agreements referenced herein, constitutes the entire agreement among the parties with respect to the transactions contemplated hereby and supersedes all prior agreements, understandings, negotiations and representations between the parties with respect to such transactions.

(e)        Amendments.  No amendment or modification of the terms and conditions of this Letter Agreement shall be valid unless in writing and signed by each of the parties hereto.

(f)        Notices.  Except as otherwise set forth in this Letter Agreement, any notice required or permitted by this Letter Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by fax (as evidenced by the sender's confirmation receipt) or by electronic mail (upon confirmation of receipt by the recipient) or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address as set forth on the first page of this Letter Agreement or as subsequently modified by written notice to the other parties in accordance with this Section 15(f).

(g)        Counterparts.  This Letter Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Facsimile or PDF electronic copies shall be treated as originals.

(h)        Interpretation of Agreement.  This Letter Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any party and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Letter Agreement.

(i)        Further Documents.  Each party agrees to promptly perform such further acts and to execute and deliver any and all further documents that may reasonably be necessary to effectuate the purposes of this Letter Agreement.

(j)        Third Party Rights.  Nothing expressed or referred to in this Letter Agreement will be interpreted or construed to give any person or entity, other than the parties and, to the extent permitted by this Letter Agreement, their respective heirs, successors and permitted assigns any legal or equitable right, remedy or claim under or with respect to this Letter Agreement or any term, condition or other provision of this Letter Agreement.

(k)        Severability.  If any part of this Letter Agreement is deemed to be invalid by any court of law, the remaining provisions of this Letter Agreement shall remain in full force and effect and may be enforced in accordance with the provisions hereof to the extent the overall benefits to each party intended hereby remain intact.

[Remainder of page left blank]

16

Please indicate your agreement with the foregoing, effective as of the date first set forth above, by signing below.

Sincerely,

TRANSTECH PHARMA, LLC

By: _____
    Name: *Stephen L Holcombe*
    Title: *President & CFO*

HIGH POINT PHARMACEUTICALS, LLC

By: _____
    Name: *Stephen L Holcombe*
    Title: *President & CFO*

HIGH POINT CLINICAL TRIALS CENTERS, LLC

By: _____
    Name: *Stephen L Holcombe*
    Title: *Senior Vice President & CFO*

M&F TTP HOLDINGS, LLC

By: _____
    Name:
    Title:

MACANDREWS & FORBES INCORPORATED

By: _____
    Name:
    Title:

Please indicate your agreement with the foregoing, effective as of the date first set forth above, by signing below.

Sincerely,

TRANSTECH PHARMA, LLC

By:_____
    Name:
    Title:

HIGH POINT PHARMACEUTICALS, LLC

By:_____
    Name:
    Title:

HIGH POINT CLINICAL TRIALS CENTERS, LLC

By:_____
    Name:
    Title:

M&F TTP HOLDINGS, LLC

By:_____
    Name: Paul Sans
    Title: EVP & CFO

MACANDREWS & FORBES INCORPORATED

By:_____
    Name: Paul Sans
    Title: EVP & CFO

AGREED AND ACCEPTED:

Adnan M.M. Mjalli, Ph.D.

SAM'S INVESTMENTS, LLC

By:

Name:
Title: Adnan M.M. Mjalli

OASIS INVESTMENTS, LLC

By:

Name:
Title: Adnan M.M. Mjalli

**Schedule A**

(See attached.)

### Schedule B

**Payment of Quarterly Distributions**

| Quarterly Distribution Payment Date | Amount of Quarterly Distribution |
|---|---|
| December 31, 2015 | $625,000 |
| March 31, 2016 | $625,000 |
| June 30, 2016 | $625,000 |
| September 30, 2016 | $625,000 |
| December 31, 2016 | $625,000 |
| March 31, 2017 | $625,000 |
| June 30, 2017 | $625,000 |
| September 30, 2017 | $625,000 |

## Exhibit A

**Amended TTP Operating Agreement**

(See attached.)