G6FNRUBC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AARON RUBENSTEIN,

            Plaintiff,     New York, N.Y.

      v.               15 Civ. 9752 (VSB)

RONALD O. PERELMAN, *et al.*,

            Defendants.
------------------------------x

                               June 15, 2016
                               2:30 p.m.

Before:

             HON. VERNON S. BRODERICK,

                          District Judge

                 APPEARANCES

DAVID LOPEZ
MIRIAM TAUBER
    Attorneys for Plaintiff

SCHINDLER COHEN & HOCHMAN
    Attorneys for Defendants
BY:  JONATHAN L. HOCHMAN

1              (Case called)

2              THE COURT:  You may be seated.

3              Good afternoon.  Let me just review for the parties

4    the documents I have in connection with today's conference.

5              I have the complaint, I guess the initial complaint

6    and then there is the amended complaint also; the defendants'

7    May 27 letter, and the plaintiff's June 2 letter.  Are there

8    any other documents I should have in connection with today's

9    conference from the plaintiff?

10             MR. LOPEZ:  I believe there is a second amended

11   complaint, your Honor.

12             THE COURT:  That is the one I was referring to.  I'm

13   sorry.  It's docket 18.  What I don't have I guess is the first

14   amended complaint, but I don't think that's relevant.  It is

15   really the second amended complaint that we are talking about.

16             From the defense?

17             MR. HOCHMAN:  Nothing else, your Honor.

18             THE COURT:  We are on for a premotion conference.

19             I do have some questions.

20             First, is the underlying contract that is at issue

21   that provided for the shares to be sold, transferred, however

22   you want to phrase it, is that referenced in the second amended

23   complaint anywhere?

24             MR. LOPEZ:  It is not referenced, but it was relied

25   on.

1           THE COURT:  All right.

2           Does the defense agree with that?

3           MR. HOCHMAN:  Yes, your Honor.  I think we would say

4  that it is either referenced, relied on, somehow incorporated

5  by reference.  Our motion could wind up being one for summary

6  judgment in name.  I don't think there are going to be any

7  disputed facts.

8           THE COURT:  The only issue with regard to treating it

9  as a motion for summary judgment, under the rule I have to

10 provide then for discovery related to that.  If the parties are

11 in agreement that the second amended complaint, it seems to me

12 that it references the stocks, which would really basically

13 trigger that.  Mr. Lopez, it sounds like there is agreement

14 anyway that it is something that the parties can rely on in

15 connection with the motion to dismiss.  I think that's right.

16 Although it is not explicitly referenced, I think clearly it is

17 something that the plaintiff needed to rely upon in drafting

18 the complaint.

19          Does that agreement provide that the payment can be

20 made with cash, securities, or -- I don't remember what the

21 other -- I thought there was one other part of that language.

22          MR. LOPEZ:  Yes, your Honor.

23          It's cash, lower-case securities, or upper-case

24 securities, which is a defined term.

25          THE COURT:  OK.  The upper-case securities, those are

1   the securities that basically we are talking about here?  Is
2   that what the definition is?
3            MR. LOPEZ:  One moment, please.
4            THE COURT:  All right.
5            MS. TAUBER:  I just want to clarify something.  The
6   agreement itself was not publicly filed.  When we drafted the
7   complaint, we didn't have it before us, but we have been
8   provided with a copy of it in subsequent discussions with
9   defendants.  I do think that you are right, that we can rely on
10  it, because it was referenced in filings that we relied on in
11  drafting the complaint, if that makes sense.
12           THE COURT:  In other words, there were certain public
13  filings that you relied on in connection with and related to
14  the stock sales and otherwise that did reference --
15           MS. TAUBER:  That referenced the agreement.  The
16  agreement itself wasn't public.  We do have a copy of it now.
17  We didn't when we drafted the complaint.  I just want to be
18  clear about that.
19           THE COURT:  Obviously, it gets me a long way if the
20  parties agree that it is something that can be relied upon.
21  Obviously, we are in a situation where we have a second amended
22  complaint.  Again, typically, although I have premotion
23  conferences, while I may try and dissuade parties out of making
24  certain motions, I don't prohibit, or at least I haven't yet
25  prohibited the making of a motion.

           Let me ask this: Mr. Hochman, in light of the fact
that it has that reference, does that change what you are
saying, and, if not, why not?

           MR. HOCHMAN: Your Honor, it doesn't change anything
at all. I think the reference is to different forms of payment
have to do with different possibilities under the contract.

           What those possibilities are is, in December of 2014,
this transaction occurred. What basically happened was that
Dr. Mjalli sold his companies to MacAndrews & Forbes and their
affiliates -- I am simplifying a bit. Part of the transaction,
in addition to getting seven and a half million dollars,
Dr. Mjalli also retained a 6 percent interest in those
companies. It didn't matter how going forward that interest
was going to be realized.

           If they just operated the companies that they bought,
there was a concept in the agreements of excess cash. So if
they just operated the companies and developed a large amount
of cash, eventually he would get his percent. If they sold the
companies, he would get his 6 percent. If they did an IPO for
the companies, which is what happened, he would get his 6
percent. The only choice upon the IPO was, is it going to be 6
percent of the common shares that are issued in the IPO or
cash.

           So there was no third possibility I think under the
IPO scenario. At least that's my understanding.

1    THE COURT: OK.

2    MR. HOCHMAN: Then there's simply a choice between do
3 we pay him his common equity in the company that has now had an
4 IPO, which is vTv Therapeutics, or do we give him cash.

5    There is crystal clear case law from the Second
6 Circuit, a case called *Magma Power v. Dow Chemical* that says it
7 doesn't matter if you have an option to pay something for 16(b)
8 purposes if you have an option to pay someone in stock or cash.

9    The reason that it doesn't matter is because when you
10 have the option, instead of paying someone stock, which is what
11 we did with Dr. Mjalli, to pay him cash, it's like having a
12 call option at market price.

13    In other words, instead of giving those shares of
14 stock, you can buy them back for cash at the market price.
15 That is fine.

16    The thing is, insiders always have that option.
17 Insiders could always, you know, go out and by at the market
18 price. What the Second Circuit says in *Magma* is not buying is
19 not the same as selling. Otherwise, every time an insider
20 didn't act, it would be considered a sale of securities, and
21 that clearly can't be the case. There would be nothing to
22 match against, or every subsequent purchase would always be
23 matchable against the decision not to buy.

24    So *Magma*, and there are at least two cases I am aware
25 of that follow it, are crystal clear that the choice of being

1    able to pay in stock or cash doesn't matter.
2             THE COURT:  What year was *Magma*?
3             MR. HOCHMAN:  *Magma* was 1998.  It's been followed much
4    more recently.  I can tell you when.
5             THE COURT:  OK.
6             MR. HOCHMAN:  By Judge Engelmayer recently.  It was
7    followed by Judge Engelmayer in a case called *Donahue v.*
8    *Murdoch* in 2013, and followed in 2006 in a case called Donahue
9    v. Centillion Communications.
10            THE COURT:  I am looking at your letter.
11            MR. HOCHMAN:  We didn't cite it because Mr. Lopez
12   hadn't raised that yet.
13            THE COURT:  That is fine.  I know that the first time
14   I saw the issue of that phrase that related to the cash was in
15   Mr. Lopez's letter.
16            Let me hear from either Mr. Lopez or Ms. Tauber.  I
17   don't know who is going to --
18            MR. LOPEZ:  We concede that *Magma* is good law.  We
19   also suggest that it's been mischaracterized.  *Magma* held that
20   inaction is not a 16(b) event.  Here we have action.  There was
21   a conscious decision to settle a debt, a debt created by the
22   letter agreement, to settle it in stock as opposed to settling
23   it in cash or whatever other medium of exchange was there.
24   That decision opens the door to the possibility of speculative
25   abuse.

1          As I described it in my letter, if, with access to
2  inside information, the defendants made the determination that
3  the IPO price was inflated and likely to go down, of course,
4  they would pay in stock and then buy it back later.
5          The defendants letter strongly urges that there was no
6  possibility of speculative abuse.  I believe the legal term for
7  that is nonsense.
8          THE COURT:  I get the idea that if you have stock and
9  you are trying to make a decision about whether to pay someone
10 in stock or to pay them in cash, if you actually have access to
11 insider information, that might lead you to understand that one
12 might be more beneficial to you than the next.  I understand
13 that argument.
14         About *Magma*, though, I guess this goes towards the
15 briefing.  Obviously I have not seen the case, but the factual
16 circumstance here, are there cases where factually the
17 circumstances are similar, in other words, where the
18 seller/purchase has this sort of an option?
19         In other words, this case, as I understand it, is
20 clear, and I think the parties agree, that the doctor was going
21 to get something, 6 percent.  He was going to get something.
22 The letter agreement apparently gives -- is it at MacAndrews &
23 Forbes discretion?  In other words, they could choose?
24         MR. LOPEZ:  Yes.
25         THE COURT:  There is no other qualification with

1    regard to that in the letter agreement?
2                MR. LOPEZ:  That's correct.
3                THE COURT:  Let me hear Mr. Hochman.
4            Do you have a different view?
5                MR. HOCHMAN:  I do, your Honor.
6                THE COURT:  All right.
7                MR. HOCHMAN:  First of all, from our perspective and
8    from the more broad perspective of the purposes of Rule 16(b),
9    the economics of this transaction were fixed in December of
10   2014, which is indisputably beyond the six-month window.
11           But to answer your narrow question about *Magma* and its
12   progeny, I am looking at the *Donahue* case now, and Judge
13   Engelmayer said, Murdoch didn't retain one piece of discretion
14   under the agreement they are talking about.  He had the option
15   exercisable between 60 and 90 days prior to the settlement date
16   to provide the cash equivalent of the Dole shares to the trust.
17               Then he goes on to cite *Magma* for the proposition that
18   the option to provide cash instead of shares, which is exactly
19   what we are talking about here, doesn't matter, and that is
20   precisely the holding in *Magma*.  Of course, we will brief it,
21   but that's the whole point.
22               THE COURT:  When you say option, I take it in the
23   Judge Engelmayer case that the purchaser/seller there could
24   have provided stock, but provided cash instead?
25               MR. HOCHMAN:  Yes.  I think *Magma* and its progeny are

1  all in the same context that we have here, which is there is an
2  obligation to provide value, and it could be in stock, although
3  there was an option at the discretion of the provider to make
4  it in cash.
5       What *Magma* essentially stands for is that the specter
6  of speculation that Mr. Lopez is raising is not something that
7  can be considered for 16(b) purposes, because that very thing,
8  the idea that an insider could go out into the market and
9  purchase, is always there.
10      THE COURT:  One other question I have for you while
11 you are standing, which is the statute of limitations, the
12 six-month period.
13      MR. HOCHMAN:  Yes.
14      THE COURT:  I think you argue that December should be
15 the trigger event or date?
16      MR. HOCHMAN:  Correct.
17      THE COURT:  I would like to hear from you on that.
18      I know obviously plaintiffs have a different view.
19 Why December?
20      MR. HOCHMAN:  Because that is when the deal with
21 Dr. Mjalli was made.
22      THE COURT:  The letter agreement was signed?
23      MR. HOCHMAN:  That is the date of the letter
24 agreement, December 30, 2014.
25      In our view, and maybe just in fact all of the

economics between MacAndrews & Forbes and its various affiliates and Dr. Mjalli were completed as of the day of that transaction. Dr. Mjalli got his money, he retained his 6 percent interest, and MacAndrews & Forbes got the companies, you know, the remaining value of the companies, but the companies to run.

So the date that Mr. Lopez and Ms. Tauber are urging is the IPO date, which followed in July of 2015. The only thing that happened on that date or near that day is that Dr. Mjalli received the transfer of his shares.

Critically, there was no additional, different, or other consideration paid to MacAndrews & Forbes. They got whatever they got back in December. Nothing about the transfer following the IPO changed what they got.

That's why we say this is not a 16(b) case. There was absolutely no opportunity for speculative abuse because MacAndrews & Forbes had already got all their value. That was it. It didn't matter that the transfer itself was going to eventuate later. There are, I think, fair to say myriad cases indicating that what is important is when the consideration or the economics get transferred. The language the court uses is when the obligations become fixed and irrevocable.

The only thing that Mr. Lopez or Ms. Tauber pointed to here that wasn't fixed and irrevocable is just the very form of the consideration allowed for the various possibilities.

Case 1:15-cv-09752-VSB Document 25 Filed 07/28/16 Page 12 of 20    12
G6FNRUBC

1                THE COURT:  In other words, cash versus stock?

2                MR. HOCHMAN:  Cash versus stock, or really it could

3      have been a merger, it could have been a sale, it could have

4      been that they operated the companies, whatever.

5                Dr. Mjalli was getting his 6 percent and there was

6      nothing that could change that and no amount of -- I don't want

7      to call it manipulation, but no amount of choosing by

8      MacAndrews & Forbes of whether it is a sale, whether they pay

9      in cash, whether it is a merger, whether it is an IPO affects

10     what they get.  So there was nothing for them to speculate

11     about.

12               THE COURT:  When we say 6 percent, I apologize because

13     I should have -- at what point in time is the value of the 6

14     percent determined?  In other words, is it at the time of the

15     IPO?  I just don't know from the letter agreement when that is.

16               MR. HOCHMAN:  Let's take the case of an IPO, because

17     that is what happened.  Whenever there is an IPO, I think the

18     language of the letter was immediately thereafter, but in

19     reality it was shortly thereafter, Dr. Mjalli was to receive 6

20     percent of the common equity.

21               THE COURT:  Yes.

22               MR. HOCHMAN:  So there was no issue of determining

23     value.  Whatever the IPO price was, it didn't matter.  He got

24     his 6 percent of the shares.

25               THE COURT:  All right.  That could have been done in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     either stock or cash, but it was 6 percent regardless?
2                MR. HOCHMAN:  Correct.
3                THE COURT:  Determined at the time of, in this case an
4     IPO.
5                MR. HOCHMAN:  Well, sorry to interrupt, but --
6                THE COURT:  I thought there were other events that
7     could have also triggered his getting the 6 percent --
8                MR. HOCHMAN:  There were --
9                THE COURT:  -- or there were other machinations.
10               MR. HOCHMAN:  Right.
11               THE COURT:  OK.
12               MR. HOCHMAN:  Other kinds of transactions, but the 6
13    percent and his right to that was fixed and irrevocable as of
14    December 30, 2014.
15               THE COURT:  I guess what I was saying, that's
16    regardless of whether it was an IPO or some other form of
17    equity event?  Is that fair?
18               MR. HOCHMAN:  Equity event or even no events at all
19    even.  If they just continued operating the companies, they
20    would have gathered up cash, and then there would have been
21    some trigger, I don't know when, and he would have been
22    receiving 6 percent of the quote excess cash.
23               THE COURT:  I will ask Mr. Lopez in a moment to talk
24    in terms of the statute of limitations, but let me ask you
25    this.  I am just trying to determine where the disputes

1   actually lie.
2          I guess in terms of a purchase and sale of securities
3   there is a dispute there, because the defense is taking the
4   position that there wasn't a sale of securities; I don't think
5   there is a dispute, or is there, concerning by an officer
6   director or of an issuer or shareholder who owns more than 10
7   percent.  You are shaking your head no, but is that a yes,
8   there is no dispute?
9          MR. HOCHMAN:  Yes, there is no dispute.
10         THE COURT:  OK.  Then there is a dispute obviously
11  with regard to the six-month period.  Let me hear, Mr. Lopez,
12  from you concerning the issue of the statute of limitations
13  here.
14         MR. LOPEZ:  Yes.  It's not really the statute of
15  limitations it's the measuring period.
16         THE COURT:  The measuring period, yes.  The triggering
17  date I guess.
18         MR. LOPEZ:  The triggering date.  There is ample
19  authority that where there are conditions precedent, until the
20  conditions precedent come about, there is no purchase or sale.
21  Here there is a shopping cart full of conditions precedent.
22  Will the transaction be A or B or C, will it be paid in Y, X,
23  or F.  There is nothing irrevocable.  There is no irrevocable
24  requirement to deliver shares as of the December date.  It had
25  to play out.

1            Additionally, where there is a floating price, a price
2    to be determined in the future, you are not dealing with a
3    derivative security until the floating price is determined, and
4    on the date that the floating price is determined that is the
5    purchase or sale date.
6            We have six pages of what ifs and whats and buts on
7    how to determine the floating price.  So, on that analysis as
8    well, nothing that happened in December constituted a purchase
9    or sale of securities.
10           THE COURT:  I guess the question is -- and I guess
11   Mr. Hochman raised this -- I think the argument would be, the 6
12   percent was set.  The calculation -- and, again, I don't have
13   the six pages of determination, and I don't have the case law
14   about this, but I guess I am going to see that.  Obviously what
15   I need to see is basically that.
16           In other words, I understand that you're pointing to,
17   well, this is the event because it is at IPO and that's when
18   things were actually exchanged, the shares went back to the
19   doctor or something like that.
20           MR. LOPEZ:  The decision was made to send shares --
21           THE COURT:  To send the shares.
22           MR. LOPEZ:  -- in a quantity equal to the dollar
23   amount of --
24           THE COURT: But there is no disagreement there that
25   something had to happen, in other words, with the IPO, whether

1   it's cash or it's stock, the doctor was getting something?
2              MR. LOPEZ:  Correct.
3              MS. TAUBER:  Sorry.  As of the IPO date, though.  Not
4   as of the December agreement.
5              THE COURT:  I think that the case law that I need to
6   see is the issue of -- yes, that is when the exchange was going
7   to occur, but he was going to get, I think the argument that
8   Mr. Hochman is making is that he was going to get his 6 percent
9   at some point.  That was fixed.  Again, I'm paraphrasing.  I
10  think what his argument is.  That was fixed as of the December
11  date.
12             I think what I need to see is cases that deal with the
13  situation as we have it here, where the payment, whether it's
14  cash or stock or some other something of value is at a later
15  date but the contract for lack of a better term is at an
16  earlier date.  So I need to see case law that discusses that
17  sort of scenario.  There may be variations on that.  In some
18  contexts it may be the earlier date, the date of contract, in
19  other contexts, it may be later, depending upon what happens,
20  depending upon what the conditions are that are part of the
21  contract.  I don't know.  Again, since I haven't seen the cases
22  I am just thinking as I'm hearing the argument here of what I
23  need to see in the motion papers.
24             MR. LOPEZ:  We will certainly try to address that.
25             THE COURT:  OK.

            All right.  Let me see if I have any additional
questions.

            Before I go on, this is an issue that I want to raise
with the parties, unrelated to the substance of the argument
that you have made.

            A former colleague of mine in the United States
Attorney's Office is currently the executive vice president
chief administrative officer and general counsel of MacAndrews
& Forbes, Steve Cohen.

            Mr. Cohen and I were in the U.S. Attorney's Office
together for several years.  For a portion of that time he was
chief of the violent gangs unit.  The last contact I had with
Mr. Cohen was in connection with arranging a school visit for,
I think they were grade school kids to come in and see my
courtroom and ask me questions as a judge.  I think that was a
year or two ago.

            I just raise the issue.  Aside from perhaps the
occasional social event that might be U.S. Attorney Office
related -- but I haven't really gone to one in several years --
I don't have any social contact with Mr. Cohen.  I don't think
it is a basis for my recusal, but I wanted the parties to know.

            If there is some issue related to that, I think the
way my colleagues have arranged it -- well, I don't think there
is an issue about that.  You can jointly let me know that one
side or the other, I don't want to know who, might have an

G6FNRUBC

1    issue.  But, again, my contacts are limited currently and even
2    in the past.
3              OK.
4              MR. LOPEZ:  Thank you.
5              THE COURT:  Paul Weiss is no longer involved in this
6    case, is that correct?
7              MR. HOCHMAN:  That is correct.
8              THE COURT:  OK.
9              Have the parties talked about a briefing schedule?
10             MR. HOCHMAN:  No, we haven't, your Honor.
11             MR. LOPEZ:  No.
12             THE COURT:  Let me ask this, Mr. Hochman.  How much
13   time would you like for your opening papers?
14             MR. HOCHMAN:  Perhaps three weeks.
15             THE COURT:  OK.  Three weeks.
16             Mr. Lee?
17             THE DEPUTY CLERK:  July 6.
18             THE COURT:  July 6.  Do you want more time?
19             MR. HOCHMAN:  Just in light of the holiday.
20             THE COURT:  Yes.
21             MR. HOCHMAN:  They took away my calendar.
22             THE COURT:  The end of that week perhaps?  Do you want
23   the following week?
24             MR. HOCHMAN:  Monday.
25             THE COURT:  Why don't we make it 30 days.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MR. HOCHMAN:  That would be great.

2           Thank you, your Honor.

3           THE COURT:  30 days.

4           MS. TAUBER:  What date is that?

5           THE DEPUTY CLERK:  July 15.

6           THE COURT:  OK.  30 days for the opposition?

7           MR. LOPEZ:  Equal time, yes.

8           THE COURT:  Two weeks on reply, Mr. Hochman?

9           MR. HOCHMAN:  That would be fine, your Honor.

10          THE COURT:  So what's that?

11          Is that the 30th or the 29th of August.

12          THE LAW CLERK:  July 15, and then August 15, August 15

13   for the opposition, and August 29 for the reply.

14          THE COURT:  OK.

15          Once I get all the briefing, I'll make a determination

16   about whether or not I think oral argument is necessary.  It

17   seems to me the parties at least agree as of today that I can

18   consider the letter agreement itself.

19          At this stage, let me ask Mr. Hochman first and then

20   Mr. Lopez.  Were there any other documents that you were

21   considering?  I understand that there are various public

22   filings that the complaint was based upon.  But were there any

23   other documents that you were considering relying upon in your

24   motion?

25          Again, this is not for purposes of holding you to it,

G6FNRUBC

1   but it's something that I think, if there is -- what I will
2   suggest is this.  If it is more than just a letter agreement, I
3   think you should meet and confer with Mr. Lopez and Ms. Tauber
4   to let them know, because they may have a different view about
5   whether or not that would mean it converts to a motion for
6   summary judgment or that I would have to do that in order to
7   consider it.
8              OK.  Is there anything else that we need to deal with
9   today?
10             From the plaintiff?
11             MR. LOPEZ:  Not that I can think of.
12             THE COURT:  From the defense?
13             MR. HOCHMAN:  No, your Honor.
14             THE COURT:  This is my first case in this specific
15  area.  I look forward to getting your papers and seeing the
16  case law on this.
17             Thank you.
18             MR. LOPEZ:  Thank you, your Honor.
19             MR. HOCHMAN:  Thank you, your Honor.
20             (Adjourned)
21
22
23
24
25