```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/30/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
AARON RUBENSTEIN,                                           :
                                                            :
                    Plaintiff,                              :
                                                            :      15-CV-9752 (VSB)
                    -v-                                     :
                                                            :      MEMORANDUM AND OPINION
vTv THERAPEUTICS, INC.,                                     :
                                                            :
                    Nominal Defendant,                      :
                                                            :
RONALD O PERELMAN, MACANDREWS                               :
& FORBES INC.,                                              :
                                                            :
                    Defendants.                             :
                                                            :
------------------------------------------------------------X

Appearances:

Miriam Tauber
Miriam Tauber Law PLLC
New York, New York

David Lopez
Law Offices of David Lopez
Southampton, New York
*Attorneys for Plaintiff*

Jonathan L. Hochman
Schindler Cohen & Hochman LLP
New York, New York
*Attorneys for Nominal Defendant vTv Therapeutics Inc. and Defendants Ronald O. Perelman and MacAndrews & Forbes Incorporated*

VERNON S. BRODERICK, United States District Judge:

  Plaintiff Aaron Rubenstein, an owner of securities of vTv Therapeutics Inc. ("vTv Therapeutics" or "Therapeutics"), brings this action against Defendants Ronald O. Perelman and MacAndrews & Forbes, seeking disgorgement of purported short-swing trading profits pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Section 16(b)"),

1

which prohibits purchases and sales of securities by corporate insiders within a six-month matching period.  Defendants argue that the transfer of securities at issue were fixed pursuant to an earlier contract, and thus not a Section 16(b) violation.  Because Plaintiff has failed to plead facts sufficient to show a sale of a security within the six month period, Defendants' motion to dismiss is GRANTED and Plaintiff's claim is DISMISSED.

I.  **Factual Background**[1]

On December 30, 2014, Defendants entered into a Letter Agreement with third party, Adnan M.M. Mjalli, pursuant to which Mjalli sold to Defendants his minority interest in two companies: TransTech Pharma, LLC and High Point Pharmaceuticals, LLC.  In exchange for his minority interest, Mjalli received a cash payment of $7.5 million, as well as the right to receive 6% of the value of those companies at a later time.  (Ltr. Agmt. §§ 2(a), 3(a).)[2]  The Letter Agreement set the terms by which the 6% value could be distributed, whether it be by sale, an IPO, a merger, or by continuing operations.  (*Id.* § 2(a)-(k).)  In the case of an initial public offering ("IPO"), it stated that Defendants "shall . . . make a payment to Mjalli in the common equity securities of the IPO Entity in an amount equal to six percent (6%) of the common equity of the IPO Entity."  (*Id.* § 2(i).)  The Letter Agreement provided that "Mjalli shall be paid . . .

---

[1] Because this is a motion to dismiss, the following facts are drawn from Plaintiff's second amended complaint. (Doc. 18.) I assume all the facts to be true, and draw all reasonable inferences in Plaintiff's favor.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My reference to these facts should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Ltr. Agmt." refers to the letter agreement dated December 30, 2014 between M&F TTP Holdings LLC, MacAndrews & Forbes Incorporated, TransTech Pharma, LLC, High Point Pharmaceuticals, LLC, and High Point Clinical Trials Center, LLC, on the one hand, and Adnan M.M. Mjalli, Ph.D., Sam's Investments, LLC and Oasis Investments, LLC, on the other.  (Doc. 24-1.)  The letter agreement is not attached to the second amended complaint.  However, a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), as well as documents upon which "the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted).  Therefore, I consider the Letter Agreement, as it is incorporated by reference into the second amended complaint.  *See* Second Amended Complaint, Doc. 18 ("SAC") ¶ 11 ("Defendants . . . [had an] obligation to sell securities to the third party . . . under a pre-existing agreement between the Defendants and the third party.").

2

simultaneously with the consummation" of any IPO.  (*Id.* § 2(j).)  In whatever way the companies were to be valued, Defendants would transfer the 6% value to Mjalli.  (*See id.* § 2(a)-(k).)

vTv Therapeutics, Inc. was a successor company to TransTech Pharma, LLC and High Point Pharmaceuticals, LLC.  vTv Therapeutics held its IPO on July 29, 2015.  (SAC ¶ 11.)  According to the second amended complaint, upon the IPO of vTv Therapeutics, Defendants "became obligated to sell 1,344,186 shares, more or less, of the Class A Common Stock of vTv Therapeutics, which Defendants had received in connection with the IPO, to [Mjalli]."  (*Id.*)  The second amended complaint characterizes the IPO as "the fulfillment of one of several alternative contingencies or conditions precedent giving rise to Defendants' obligation to sell securities to [Mjalli] under [the Letter Agreement]."  (*Id.* ¶ 11.)  It further alleges that "[t]he fixing of the obligation to sell vTv Therapeutics securities upon the IPO . . . converted Defendants' conditional or contingent contractual obligation with respect to the sale of vTv Therapeutics securities to [Mjalli] into a derivative security, characterized as a 'put equivalent' position under applicable SEC Rules, and deemed a 'sale' of securities under Section 16(b) at the time of the IPO on July 29, 2015."  (*Id.* ¶ 12.)

Defendants subsequently purchased vTv Therapeutics stock on the open market between August 2015 and January 2016.  (*Id.* ¶¶ 14-17.)  During all relevant times, Defendants were the beneficial owners of more than 10% of the common stock of Therapeutics.  (*Id*. ¶ 5.)

## II.   Procedural History

Plaintiff brought this action on behalf of vTv Therapeutics by filing a complaint on December 14, 2015.  (Doc. 1.)  Plaintiff twice amended his complaint.  (Docs. 6, 18.)  Defendants sought a pre-motion conference to discuss their proposed motion to dismiss, (Doc.

3

19), and Plaintiff responded on June 2, 2016, (Doc. 20).  On June 15, 2016, I held a pre-motion conference during which I set a briefing schedule for Defendants' motion to dismiss.  (Doc. 25 at 18-19.)  Thereafter, on July 15, 2016, Defendants filed their motion to dismiss the second amended complaint, together with a Declaration of Jonathan L. Hochman, which attached a copy of the Letter Agreement.  (Docs. 22-24.)  Plaintiff filed his response papers on August 29, 2016 after being granted an extension of time, (Docs. 28, 30-31), and Defendants filed their reply brief on September 19, 2016, (Doc. 32).

### III.     Applicable Law

#### A.     *Standard of Review*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Id.*

### B. *Section 16(b) of the Securities Exchange Act*

Section 16(b) of the Securities Exchange Act provides as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer . . . , any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b). In other words, to prevent insider abuse, an insiders' so-called "short swing profits" are subject to disgorgement. Statutory insiders include directors, officers, and "beneficial owners" of more than 10% of a company's registered securities. *Id*. § 78(a)(1), (b). Because Section 16(b) is "intended to prevent the defined insiders from profiting from short-swing variations in share price," it "imposes a strict-liability rule for disgorgement of profits." *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 129 (2d Cir. 2016). Section 16(b) thus "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998).

Liability under Section 16(b) requires "(1) a purchase and (2) a sale of securities (3) by a statutory insider (4) within a six-month period." *Roth v. Solus Alternative Asset Mgmt. LP*, 124 F. Supp. 3d 315, 321 (S.D.N.Y. 2015) (citing *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865 869 (2d Cir. 2014)). "Financial instruments that do not fall squarely into this framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)." *Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013).

Due to the "growing complexities of financial transactions," the Second Circuit has acknowledged two guiding principles in Section 16(b) interpretation: first, given the breadth of

5

the statutory terms "purchase" and "sale," which "have the potential to 'reach many transactions not ordinarily deemed a sale or purchase," "courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse." *Goldman Sachs*, 740 F.3d at 869-70 (quoting *Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973)).  Second, rules promulgated by the SEC addressing the "increasing use of instruments and transactions that do not fit comfortably into Section 16(b)'s simplistic scenario of purchases and sales of common shares," are given deference.  *Id.*; *see Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008).

## IV.   Discussion

In this case, there is no dispute that Defendants owned more than 10% of the common shares of Therapeutics at the time of the IPO.  It is also not disputed that Defendants purchased shares of Therapeutics between August 2015 and January 2016.  Plaintiff alleges that the post-IPO transfer of Therapeutics shares from Defendants to Mjalli constituted a "sale" under Section 16(b) such that it should be "matched" with Defendants' subsequent purchases under applicable SEC rules.  (SAC ¶¶ 17-19.)  Therefore, the only issue is whether Defendants' transfer of securities to Mjalli was a "sale" under Section 16(b).  I agree with Defendants that the transfer here was not a sale because Defendants were contractually bound by the Letter Agreement entered into on December 30, 2014 to provide Mjalli with the 6% "of the common equity of the IPO Entity" in the event of an IPO.  (Ltr. Agmt. § 2(i).)

Plaintiff points to Defendants' SEC filings reflecting "actual receipt" of shares in connection with the IPO as evidence of their ownership, (Pl.'s Br. at 5), but ownership in this context "does not turn on the possession of a share certificate;" rather, "issuance of a share certificate is merely an indicium of ownership."  *Donoghue v. Local.com Corp.*, No. 07 Civ.

8550(LBS), 2009 WL 260797, at *3 (S.D.N.Y. Feb. 3, 2009).  In determining when the sale occurred, the "critical moment" is the "point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor."  *Prager v. Sylvestri*, 449 F. Supp. 425, 431-33 (S.D.N.Y. 1978).

     Here I find that Defendants were "irrevocably bound" to transfer the shares at the time they agreed to the terms of the Letter Agreement, which contractually committed them to providing the predetermined value in securities in the event of an IPO.  (*See* Ltr. Agmt. § 2(i).)  By transferring the shares, Defendants were merely satisfying a term in the Letter Agreement that had been contracted for several months prior, and over which they had no control.  Other decisions from this District uniformly support the view that the relevant date of sale in this context is the date of the contract's execution.  *See Patterson*, 990 F. Supp. 2d at 426 (holding that date of contract execution, rather than date of settlement, was operative date for purposes of Section 16(b)); *Chechele v. Perling*, No. 11 Civ. 0146(PAC), 2012 WL 1038653, at *4-5 (S.D.N.Y. Mar. 29, 2012) (granting motion to dismiss where transfer of shares on settlement date "dependent upon formulas which were set two to three years earlier, when [the insiders] entered into the agreements," and there was no subsequent modification of the formulas), *aff'd* 758 F.3d 463 (2d Cir. 2014); *Donoghue v. Murdock*, No. 13 Civ. 1224(PAE), 2013 WL 4007565, at *9 (S.D.N.Y. Aug. 6, 2013) (rejecting argument that transfer of shares was a sale because the insider had "lost any ability to control" transfers pursuant to terms of earlier contract); *Donoghue v. Centillium Commc'ns Inc.*, No. 05 Civ. 4082(WHP), 2006 WL 775122, at *5 (S.D.N.Y. Mar. 28, 2006) (concluding that there was no Section 16(b) sale where insider was obligated to

transfer shares pursuant to earlier contract and the only opportunity to manipulate the transaction or exploit insider knowledge was at the time of that contract).

Plaintiff argues that Defendants were not "irrevocably bound" until the IPO because, up until that point, they were not obligated to transfer securities. In other words, because it was not certain that an IPO would occur at all, Defendants' commitment to transfer the securities (as opposed to cash) was not fixed. The contract does leave open the possibility of different methods of payment if an IPO did not occur. However, even if the occurrence of an IPO were considered a floating term, "the transaction is exempt from Section 16(b) liability at settlement as long as the insider is irrevocably obligated to settle a transaction at a certain date and have the price calculated by a pre-set formula." *Patterson*, 990 F. Supp. 2d at 426. Because the Letter Agreement explicitly mandated the transfer of 6% of the common equity in the event of an IPO, Defendants were irrevocably bound to those terms at the time they entered into the Letter Agreement.

For the same reason, when Defendants came into possession of the subject securities, they were not the "beneficial owners" of the securities, as they lacked any pecuniary interest in them. Section 16(b) requires that the securities at issue be beneficially owned by the insider. *See Feder v. Frost*, 220 F.3d 29, 33-34 (2d Cir. 2000). The term "beneficial owner" means "any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities." *Id*. (quoting 17 C.F.R. § 240.16a-1(a)(2)). "Pecuniary interest" is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." *Id*. (quoting 17 C.F.R. § 240.16a-1(a)(2)(i)). Because Defendants were bound by the Letter Agreement to provide the fixed amount to Mjalli, they lacked any pecuniary interest in the subject securities at the time of the transfer, and were therefore not

beneficial owners. Any and all consideration Defendants received in exchange for the securities was tendered at the time of the Letter Agreement, months prior to the IPO.[3] *See Local.com Corp.*, 2009 WL 260797, at *3 (it is a "general rule" that "privileges and rights of ownership are gained once the full consideration has been tendered for the security").

Plaintiff also argues that the IPO was a "material condition precedent" to the agreement such that the agreement was revocable until it was satisfied.[4] This is clearly false, as the Letter Agreement contemplates Mjalli's payment in the event of no IPO, and, in any event, the economics of transaction were locked-in by the Letter Agreement and neither party could back out. The cases Plaintiff cites are not to the contrary since in each case one or both parties could back out or alter the subject transaction. *See Champion Home Builders Co. v. Jeffress*, 490 F.2d 611, 618 (6th Cir. 1974) (because either contracting party could have backed out of the deal prior, defendant not entitled to rely on earlier date); *Stella v. Graham-Paige Motors Corp.*, 232

---

[3] Plaintiffs point out that the 1,344,186 shares transferred actually amount to less than 6% of the shares received by Defendants, and assert that the "arithmetical implication is that a pre-existing debt from the Defendants to Dr. Mijalli was cash-settled (e.g., by withholding a number shares valued at the IPO price equal to the discharged debt)." (Pl. Br. 1 n.1.) However, the transfer of less than 6% of the shares was the result of pre-set terms in the Letter Agreement, which states that the 6% was subject to § 1(e), requiring the payoff of certain pre-existing notes. (*See* Ltr. Agmt. § 1(e) ("[I]f Mjalli is entitled to receive any proceeds under Section 2, such amounts, up to the 2009 Note Repayment amount, with respect to the 2009 Note, and the 2010 Repayment Amount, with respect to the 2010 Note, shall be retained by TTP or HPP, as applicable, and paid to Holdings in satisfaction of the 2009 Note and the 2010 Note . . . ."). Although Plaintiff also asserts that he "lacks information necessary to evaluate" whether additional consideration was transferred from Defendants to Mjalli on or after the IPO, (Pl.'s Br. at 4-5), there is nothing in the second amended complaint to suggest that any additional consideration was received.

[4] In his original pre-motion letter and during the pre-motion conference, Plaintiff argued that the Letter Agreement provided that, in the event of an IPO, Defendants had the *option* of either issuing stock or paying the 6% in cash equivalent. That is incorrect. The Letter Agreement explicitly provides that "[if] there is an IPO . . . [Defendants] shall or shall cause the IPO entity to make a payment to Mjalli in the common equity securities of the IPO entity in an amount equal to six percent (6%) of the common equity of the IPO Entity." (Ltr. Agmt. § 2(i).) I read this language to mean that payment could only occur "in the common equity securities." Indeed, Plaintiff appears to have abandoned the argument that Defendants had the option of paying the 6% in cash equivalent. (*See* Pl.'s Br. at 3.) Nevertheless, a failure to exercise the option to settle a pre-contracted settlement in cash as opposed to stock is not considered a Section 16(b) event in this Circuit. *See Magma Power*, 136 F.3d at 325 ("A failure to purchase . . . is not a sale."); *Donoghue*, 990 F. Supp. 2d at 427 (explaining that *Magma Power* "precludes consideration of the option to settle in cash as a 'purchase' where the insider did not exercise the option"); *Murdock*, 2013 WL 4007565, at *9; *Centillium*, 2006 WL 775122, at *5.

F.2d 299, 302 (2d Cir. 1956) (term in letter agreement provided that insider could terminate if unable to secure financing); *Morales v. Gulf Energy & Dev. Corp*, No. 77-F-165, 1977 WL 1052, at *2 (D. Colo. Oct. 4, 1977) (neither party bound because insider was first required to register shares before purchase considered final).

Finally, Plaintiff is unable to point to any speculative abuse that would result from the type of transaction agreement here. There is "no reason for the application of Section 16(b) to a transaction that poses no danger whatever of insider abuse." *Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966). "[I]t would seem to follow that in order to avoid 'purposeless harshness' a court should first inquire whether a given transaction could possibly tend to accomplish the practices Section 16(b) was designed to prevent." *Id*. "The two primary 'indices' used for measuring the potential for speculative abuse are (1) the defendant's access to inside information (as distinguished from possession of it), and (2) the defendant's ability to influence the timing and circumstances of the transaction at issue." *Olagues v. Icahn*, No. 1:15-cv-2476-GHW, 2016 WL 1178777, at *14 (S.D.N.Y. Mar. 23, 2016) (quoting *Donoghue v. Cas. Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 231-32 (S.D.N.Y. 2005)).

Plaintiff suggests that, "[a]s controlling shareholders with representation on the vTv Board, Defendants certainly had the ability to influence the timing and price of the IPO." (Pl.'s Br. at 24 (emphasis omitted).) But, even assuming Defendants could manipulate whether and when the IPO occurred, this has nothing to do with Section 16(b), which is aimed at preventing the use of insider information "as a basis for *purchasing or selling* the issuer's equity securities at an advantage over persons with whom they trade." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir.1998) (emphasis added). Section 16(b) was not designed to prevent whether an IPO happens in the first instance. *See Patterson*, 990 F. Supp. at 426 ("[T]he

relevant kind of insider influence targeted by Section 16(b) is the use of informational advantages to generate profits, not the use of market power to drive up share price improperly."). Plaintiff provides no explanation of how the transaction would lead to the type of short-swing speculation or speculative abuse contemplated by Section 16(b). *See Olagues*, 2016 WL 1178777, at *14-15 ("What is missing . . . is any argument explaining how any element of Defendants' transaction . . . shows indicia of speculative abuse within the 6 month short-swing window.").

## V. Conclusion

For the foregoing reasons, Defendants motion to dismiss, (Doc. 22), is GRANTED and the second amended complaint is DISMISSED with prejudice. The Clerk of Court is respectfully directed to enter final judgment in favor of defendants and close the case.

SO ORDERED.

Dated: March 30, 2017
New York, New York

Vernon S. Broderick
United States District Judge